# United States Court of Appeals
## For the First Circuit

No. 02-1623

UNITED STATES OF AMERICA,

Appellee,

v.

RALPH CASAS,

Defendant, Appellant.

No. 02-1624

UNITED STATES OF AMERICA,

Appellee,

v.

FELICIANO NIEVES,

Defendant, Appellant.

Nos. 02-1785
     02-1674

UNITED STATES OF AMERICA,

Appellee,

v.

WINSTON CUNNINGHAM,

Defendant, Appellant.

No. 02-1794

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL SEGUI-RODRIGUEZ,

Defendant, Appellant.

―――――――――――――

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Carmen Consuelo-Cerezo, U.S. District Judge]

―――――――――――――

Before

Boudin, Chief Judge,
Lynch, Circuit Judge,and
Howard, Circuit Judge.

―――――――――――――

Elfrick Méndez-Morales for appellant Casas.
Raymond L. Sanchez-Maceira for appellant Nieves.
Marcia J. Silvers for appellant Cunningham.
Joseph S. Berman for appellant Segui-Rodriguez.
Nelson Pérez-Sosa, Assistant United States Attorney, with whom Thomas F. Klumper, Assistant United States Attorney, H.S. Garcia, United States Attorney, and Sonia I. Torres-Pabón, Assistant United States Attorney, Chief, Criminal Division, were on brief for appellee.

―――――――――――――

January 20, 2004

―――――――――――――

**LYNCH**, **Circuit Judge**.  Four defendants, Ralph Casas, Feliciano Nieves, Winston Cunningham, and Raphael Segui-Rodriguez, were convicted by a jury of participating in a drug organization that smuggled massive amounts of cocaine and heroin from Puerto Rico and several foreign countries into Miami and New York from September 1992 to March 1995.

Ralph Casas and Winston Cunningham were convicted of using their positions as  baggage handlers for American Airlines to smuggle the drugs past customs and security personnel at the Miami International Airport.  Raphael Segui-Rodriguez and Feliciano Nieves were convicted of participating in all facets of the organization's operations in Puerto Rico, the point from which most of the drug shipments were prepared.

In this appeal, the four defendants raise a number of serious concerns about their trial.  We vacate the conviction of defendant Cunningham because the government improperly used as a lead witness a government agent who testified that, based on his investigation, the defendants were members of the charged drug conspiracy.  The error was not harmless as to Cunningham, but was harmless as to the other defendants.

In the case of defendant Segui-Rodriguez, we also reject the government's suggestion that we adopt a rule that, for speedy trial purposes, the clock does not start until the indictment is unsealed.  But we find that the delay of over five years from

indictment to trial did not violate Segui-Rodriguez's speedy trial rights where the government did not know his location during that period and no prejudice has been shown. We also note, but do not resolve, an issue about the interplay between the prejudice prong of the Brady disclosure requirements and the government's obligations under the Jencks Act, 18 U.S.C. § 3500, to disclose evidence only at certain times. Finally, we again affirm the imposition of a sentence by a judge other than the judge who heard the trial.

**I.**

The facts are recounted as a reasonable jury could have found them, in the light most favorable to the verdict.

A sophisticated drug organization, based principally in Puerto Rico, transported large quantities of cocaine and heroin into the United States between September 1992 and March 1995. The leader of the organization, Israel Perez-Delgado, coordinated the work of approximately sixty subordinates. Working together, the members of the organization transported drugs from Puerto Rico, the Dominican Republic, and Panama into Miami International Airport for ultimate distribution in New York. In total, the organization smuggled approximately 9,000 kilograms of cocaine and approximately 1,400 grams of heroin into the continental United States.

The organization used various methods to smuggle the drugs past customs and security personnel. In one scheme, women

"mules" traveled on commercial flights from the Dominican Republic to Miami with professionally altered garment bags containing cocaine. On later flights the mules carried the cocaine directly on their bodies. The organization also mailed cocaine to Miami using overnight mail carriers. The drugs were stored in toolboxes, and packaged with Ben Gay and Vick's Vaporub to cloak their smell. Another method used by the organization involved hiding heroin in the carved-out soles of sneakers. And a fourth scheme used American Airlines flights to transport suitcases filled with cocaine from Puerto Rico and the Dominican Republic to Miami.

Defendant Ralph Casas was in charge of the organization's operations in Miami, the entry point for most of the drugs into the continental United States. Casas was a baggage handler for American Airlines at Miami International Airport and recruited other employees to help divert drug shipments past normal security and customs checkpoints. For instance, Bryan Francis, a cooperating government witness and former American Airlines employee, testified that he and Casas met at the Miami airport, where Casas gave him shipments of cocaine that had been mailed to Miami from Puerto Rico and had not yet been screened by security personnel. Francis then bypassed security by using the employee's entrance to the bag room area, traveled up to the terminal where the passengers that had passed through security were waiting to board flights, and regrouped with Casas. At that point, Casas

-5-

directed Francis to a third individual, who took possession of the cocaine and boarded a flight headed for New York. Casas paid Francis $2500 per importation; they used this method three times.

Casas also recruited "Rasta," another employee of American Airlines, to help smuggle drugs into the United States. At trial, Francis and two other government witnesses, Carlos Perez-Delgado and Thomas Martinez, identified defendant Cunningham as Rasta. Cunningham testified, denied any involvement, but admitted that he was called "Rasta" by some American Airlines employees.

Rasta provided assistance when one of the organization's mules, most frequently Elizabeth Morales, a cooperating witness, traveled on a flight from the Dominican Republic to Mexico that stopped off in Miami (Morales did not identify Cunningham as Rasta). In the Dominican Republic, the mule would check a suitcase containing cocaine. Because its ultimate destination was international, the suitcase did not go through customs when it arrived in Miami, but was placed in a secluded area known as the ITI room. Rasta, who had access to this area, then placed the suitcase in an area where Francis picked it up, moved it to a storage room for domestic bags that had already gone through security, and put a new tag on it indicating that its destination was New York. This occurred about four times, until Casas decided to rely exclusively on another member of the organization (not on trial in this case) to perform Rasta's function.

Casas also stored drugs in his house in Miami, assisted in packaging cocaine, and facilitated the delivery of drugs to New York or directly to Israel Perez-Delgado when he was in Miami. He assisted in purchasing weapons and bullet-proof vests to be used in the course of searching for several people suspected of stealing a shipment of drugs from the organization. Thomas Martinez testified that, at a meeting held in New York after Israel Perez-Delgado was arrested, Casas attempted to take control of the organization. Martinez also testified that Cunningham attended that meeting.

Defendant Rafael Segui-Rodriguez worked directly for Israel Perez-Delgado in Puerto Rico and assisted him in all areas of the operation. He served as a bodyguard for Israel Perez-Delgado and Ray Cabassa, another high-ranking member of the organization. Additionally, he provided armed security for the drugs while they were in storage awaiting shipping and distribution. Segui-Rodriguez also transported firearms and surveillance equipment from Miami to Puerto Rico and New York for the organization.

Several witnesses specifically identified Segui-Rodriguez as participating in drug transactions on behalf of the organization. Thomas Martinez, for instance, testified that Segui-Rodriguez helped deliver cocaine to Israel Perez-Delgado's New York City apartment by hiding it inside an audio speaker in the trunk of the car he was driving. Three guns were also in that car.

-7-

DEA Agent Stoothoff also testified that he saw Segui-Rodriguez, along with several others, drop off four suitcases of cocaine at the Puerto Rico airport on March 21, 1994. Agent Stoothoff testified that Segui-Rodriguez was sitting in the driver seat of a black Pontiac TransAm in front of the airport and that an Isuzu Trooper was parked directly behind the TransAm. As Agent Stoothoff and a fellow officer walked toward the two vehicles, they saw several people inside the cars and observed Israel Perez-Delgado unloading suitcases from the Isuzu Trooper. Once the officers got even closer, the people suddenly fled. Three were caught: Jose Velez-Roman, Hector Martinez-Medina and Jose Charluisant-Pagan were arrested, but Rafael Segui-Rodriguez escaped after he sped off in the TransAm. Another DEA agent, Miguel Escalera, also recounted this incident at the airport. The suitcases were each filled with about twenty kilograms of cocaine and had been labeled with agricultural stickers. The Isuzu also contained an American Airlines boarding pass with the name "Rafael Rodriguez" on it.

After being confronted with this evidence, Martinez-Medina offered to cooperate and led officials to a house in Villa Fontana that he claimed contained cocaine. Stoothoff and his fellow officers secured a search warrant and found in the house drug paraphernalia, stickers from the Department of Agriculture, packaging material that matched materials found in the seized

suitcases, and a Casio business organizer. The entries in the business organizer contained the names and numbers of organization members, including defendants Casas, Segui-Rodriguez, and Nieves. It did not contain any information for Cunningham.

Defendant Feliciano Nieves also worked directly for Israel Perez-Delgado, who was his brother. Nieves picked up the suitcases of cocaine that arrived in New York from Miami and brought back to Puerto Rico the money obtained from selling the drugs in New York. Additionally, he provided security for the drugs before they were shipped.

On several occasions, Feliciano Nieves helped smuggle drugs past customs officials. For instance, he traveled to Panama with several mules and packaged heroin inside the soles of the sneakers that they brought back with them to Miami. He also assisted with packaging cocaine in both the toolboxes and the suitcases. At least once, Nieves himself served as a mule and brought cocaine from Puerto Rico to New York.

**II.**

The four appellants in this case, Ralph Casas, Feliciano Nieves, Winston Cunningham, and Rafael Segui-Rodriguez, were originally indicted on December 13, 1995, along with fifty-six co-defendants. The grand jury later returned a six-count superseding indictment on August 8, 1996, against the same sixty defendants. Count I charged all sixty defendants with conspiring between

September 1992 and March 1995 to possess with intent to distribute approximately 1,400 grams of heroin and 9,445 kilograms of cocaine in violation of 21 U.S.C. § 846. Count II charged seven of the defendants, including appellant Rafael Segui-Rodriguez, with aiding and abetting each other in knowingly possessing with intent to distribute approximately eighty-one kilograms of cocaine in violation of 21 U.S.C. § 841. None of the remaining four counts applied to the appellants here.

The district court severed the trial of the four appellants from that of the other fifty-six indicted defendants. The first group of indicted defendants to be tried were convicted after a nine-month trial starting in May of 1999. The four appellants were tried together before a jury from November 6 to November 28, 2001; the jury found each guilty of the first count in the superseding indictment and found Rafael Segui-Rodriguez guilty of the second count.

The appellants were sentenced in April of 2002 by a different judge. Casas received a life sentence. Both Nieves and Segui-Rodriguez were sentenced to 360 months imprisonment, with a supervised release period of ten years for Nieves and eight years for Segui-Rodriguez. Cunningham was sentenced to serve 325 months in prison and to a supervised release period of five years. Additionally, Cunningham and Casas were each fined $50, Nieves was fined $150, and Segui-Rodriguez was fined $100.

# III.

## A.  Pre-trial claims

### 1.  Denial of Motion for Severance
#### (Casas)

Casas appeals the denial of his motion to sever his trial from that of his three co-defendants.  Casas argues that he was prejudiced by being tried with his three co-defendants because much of the evidence presented at trial would not have been admissible against him in a separate trial.  In particular, Casas points to the testimony of Elizabeth Morales regarding her trips to Panama and to Agents Stoothoff's and Escalera's testimony about the incident at the San Juan airport on March 21, 1994.

Review of the denial of a motion to sever is for abuse of discretion.  The key question is whether the "allegedly improper joinder likely deprived [the defendant] of a fair trial." United States v. Burgos, 254 F.3d 8, 13 (1st Cir. 2001) (internal quotation marks and citation omitted).  Severance in cases where the defendants were indicted together creates the possibility of inconsistent verdicts and taxes judicial resources. United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001).  As such, a defendant wishing to sever his trial from commonly indicted co-defendants must make a particularly compelling showing of prejudice.  See Zafiro v. United States, 506 U.S. 534, 539 (1993).

One classic way of attempting to show that a trial was not fair is to argue that testimony otherwise inadmissible against a defendant in a separate trial has been admitted in the joint trial. Casas presents three instances of such testimony: Morales's testimony about smuggling heroin from Panama into the United States and Agent Stoothoff's and Agent Escalera's testimony about the incident at the Puerto Rico Airport. At least some of this testimony, however, would likely have been admissible against Casas in a separate trial. See United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994) (defendants cannot seek severance based on spillover evidence that would have been admissible against them in separate trial). For instance, even though Casas was not directly involved in smuggling heroin from Panama, Morales's description of this process would likely have been admissible against Casas to show the scope of the conspiracy in which he knowingly participated. See United States v. LiCausi, 167 F.3d 36, 45-46 (1st Cir. 1999). Similarly, some of Agent Stoothoff's and Agent Escalera's testimony would probably have been admissible against Casas in order to demonstrate the sequence of events through which the authorities learned about his role in the organization. Regardless, it is well understood that "a measure of evidentiary spillover is a foreseeable concomitant of virtually every joint trial, yet seldom indicates undue prejudice." United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998).

-12-

2.  Sixth Amendment Right to Speedy Trial

    (Segui-Rodriguez)

Segui-Rodriguez argues that his Sixth Amendment right to a speedy trial and his rights under Fed. R. Crim. P. 48(b) were violated by the delay between when his original indictment was returned, December 13, 1995, and when he was arraigned, May 17, 2001.  Such claims are analyzed by balancing four considerations: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant.  Barker v. Wingo, 407 U.S. 514, 530 (1972); United States v. Trueber, 238 F.3d 79, 87 (1st Cir. 2001).  The length of the delay between indictment and arraignment here was five-and-a-half years.

The government urges that we adopt a bright-line rule that the relevant time period for purposes of the right to a speedy trial begins to run only once the indictment is unsealed, which was about seven months before trial here.  The government cites no case supporting its argument.[1]  We reject the government's position. The Supreme Court in Barker has mandated a balancing test, and the government's bright line rule is inconsistent with Barker.

It is easy to imagine a situation where, by the time an indictment is unsealed, the defendant suffers prejudice --

---

[1]Perhaps the government has confused the speedy trial claim with the rule that a properly sealed indictment is timely even if it is made public after the end of the statutory limitations period.  Wright, King & Klein, 3B Federal Practice & Procedure Criminal § 814 (3d ed. 2003).

-13-

important documents may be destroyed or key witnesses may die as a result of a delay caused by sealing the indictment. This is true whether the government's reasons for sealing the indictment are good or bad, see United States v. Thompson, 287 F.3d 1244, 1252-56 (10th Cir. 2002). The reasons for sealing may certainly be relevant to the analysis.

We see no reason why a defendant should not be able to make a speedy trial claim when the government has delayed the trial by sealing the indictment, regardless of the government's reasons. Instead, we adhere to the Barker rule that these facts must be considered under the four-part inquiry. Prosecutors bear the primary burden of bringing a case to trial; they may not hide behind the sealing of an indictment to avoid examination of the delay that they cause.

There are two reasons why Segui-Rodriguez's right to a speedy trial was not violated: the government had a legitimate reason for the delay and there was no prejudice. The government has some obligation of diligence in efforts to find the accused. Doggett, 505 U.S. at 652-53. The trial court determined that the prosecution was unable to locate Segui-Rodriguez until March of 2001, when it learned that he was imprisoned in New York State. Once it discovered his whereabouts, the prosecution quickly acted to have him transferred to Puerto Rico so the criminal proceedings against him could commence. Segui-Rodriguez has not shown any

error in the trial court's conclusion that the government did not intentionally delay and genuinely did not know where he was. He has also not shown any lack of diligence on the part of the government in attempting to locate him.

Segui-Rodriguez complains, without providing any specifics, that some of the witnesses may have had unclear memories. This consideration, though, "is a two-edged sword . . . [because] [i]t is the Government that bears the burden of proving its case beyond a reasonable doubt." United States v. Loud Hawk, 474 U.S. 302, 315 (1986). Segui-Rodriguez makes no separate argument that the seven months between arrest and trial was itself a speedy trial violation.

**B. Trial Claims**

1. Evidentiary Claims

Review of rulings on preserved evidentiary objections is for abuse of discretion. United States v. Santana, 342 F.3d 60, 68 (1st Cir. 2003). Review of evidentiary rulings where no objection was made is for plain error. Under the plain error test, the reviewing court must find (1) error, (2) that is plain, (3) and affects substantial rights, (4) and then should only act if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 731-36 (1993).

a.  "Triggerman" evidence

(Nieves)

Nieves argues that the testimony of Carlos Perez-Delgado that Nieves was a "triggerman" in the organization was impermissible character evidence and unfairly prejudicial because it suggested without foundation that Nieves carried a weapon.  At trial, counsel for Nieves objected to Perez-Delgado's testimony and the district court sustained that objection.  Nieves argues that the trial court should also have sua sponte told the jury to disregard this testimony, though he did not request such an instruction at trial.

Generally, a district court has no obligation to caution a jury to disregard every improper statement made by a witness when it has sustained an objection to that statement.  See United States v. De La Cruz, 902 F.2d 121, 124 (1st Cir. 1990) (the general rule is that a trial court's failure sua sponte to give a cautionary instruction is not reversible error).  There is nothing extraordinary here to warrant an exception to that rule.

b.  Brady Claims

A Brady violation has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  United States v. Joselyn, 206

-16-

F.3d 144, 153 (1st Cir. 2000) (quoting <u>Strickler</u> v. <u>Greene</u>, 527 U.S. 263, 280 (1999)).  In determining prejudice, the test is not whether the verdict would have been different, but whether there is a reasonable probability that the favorable evidence would put the whole case in such a different light as to undermine confidence in the verdict.  <u>Id.</u> at 152 (quoting <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434 (1995)).

    i.  Casas

Casas argues that the prosecution failed to turn over exculpatory evidence that he requested in pre-trial motions, thereby violating <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).  This evidence includes the plea and cooperation agreements of two government witnesses, Thomas Martinez and Elizabeth Morales, the results of a positive drug test taken by Morales, and the transcript of government witness Wilson Rodriguez's testimony in an earlier trial of the four defendants' alleged co-conspirators. Casas argues that the government's failure to disclose this evidence in a timely fashion hindered his ability to impeach these government witnesses.  <u>See</u>  <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150, 153-55 (1972).  Each of Casas's claims raises different concerns.

The plea agreements of the two government witnesses, Martinez and Morales, were belatedly given to the defendants after the second day of trial.  In cases of delayed disclosure, "the test is whether defendant's counsel was prevented by the delay from

using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Villarman-Oviedo, 325 F.3d 1, 13 (1st Cir. 2003) (internal quotations omitted); see United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990) (the defendant must show "a plausible strategic option which the delay foreclosed").

The court acted promptly and appropriately to offset any potential harm to Casas. When the defense first objected during trial that it had not received the agreements, the court ordered the prosecution to turn over all such agreements that day, before the defense was to cross-examine any of the government's witnesses who had signed such an agreement. The government also agreed not to elicit any testimony from Morales -- the witness on the stand when the defense lodged its objection -- about her plea agreement (beyond the fact that she had signed one) until the following day, at which point the defense would have had an opportunity to review the agreements.

The defense cross-examined Morales effectively regarding the plea agreement the next day -- Casas's counsel spent the bulk of his cross-examination questioning Morales about the favorable treatment she received from the government in exchange for her cooperation in the case. The defense had an even greater opportunity to prepare for cross-examining Martinez about his plea

-18-

agreement, as he was not called to be a witness until November 12, four days after the government turned over his plea agreement.

Casas next argues that the government did not reveal that Morales had tested positive for drug use after she started cooperating with the government in this case. While being cross-examined, Morales explained that she had been administered weekly drug tests as part of her cooperation agreement with the government and that she had failed one such test in 1996. Defense counsel then objected to not receiving this information in discovery. As the district court pointed out and defense counsel acknowledged, the admission that Morales had failed the test meant that there was no prejudice. See United States v. Jadusingh, 12 F.3d 1162, 1166 (1st Cir. 1994) (no prejudice when a government witness's past substance abuse was fully disclosed to the jury in his testimony).

Casas also argues that the government did not produce a transcript of government witness Wilson Rodriguez-Pelaez's testimony in the 1999 trial of the defendants' alleged co-conspirators. Casas first requested the transcript the day after Rodriguez-Pelaez began his testimony. In response, the prosecution informed the court that, to the best of its recollection, the earlier testimony had not been transcribed. When Casas complained that he was at a disadvantage, the court responded that "you can't ask in the midst of a trial for a transcript that does not exist." It is not clear from the record whether the prosecution was correct

-19-

that Rodriguez-Pelaez's testimony from the earlier trial had not been transcribed. Whether or not it was transcribed and whether the government should have produced it or Casas should have ordered a transcript himself need not be resolved. Casas still has not shown what inconsistencies, if any, exist between Rodriguez-Pelaez's testimony in this trial and his earlier testimony, and so no harm is evident.

    ii.  Cunningham

        Cunningham separately argues that the prosecution violated its Brady obligations on two occasions. The first alleged Brady violation arose with the testimony of cooperating witness Bryan Francis. During cross-examination, Cunningham's counsel asked Francis if he had committed perjury on his application for United States citizenship; the application contains a question asking whether the applicant has ever trafficked in narcotics. This was the first time that Francis's citizenship application had come up at trial and Cunningham had not requested the actual citizenship application during discovery. Francis responded that his answer to the question on the citizenship application -- which denied any involvement in narcotics trafficking -- was truthful at the time made. Francis said he filled out the application in 1993, before he first started trafficking in narcotics. The day after Francis finished testifying, Cunningham's attorney for the first time requested a copy of Francis's citizenship application from the

-20-

government.  The government stated that it would be "virtually impossible to produce [the record] without [] prior notice that [it] would be required," but then did produce the document within six days after Cunningham had finished presenting his defense.  The citizenship application showed that it was filed in 1995, indicating that Francis had given a false answer on the application when he denied trafficking drugs.  Despite this new evidence, Cunningham made a strategic choice not to recall Francis to the stand.

There was no violation because the prosecution had no obligation to produce the document under Brady.  The obligation under Brady to disclose evidence that the defense has not requested applies only when the prosecution or others acting on its behalf knew or should have known of its materiality.  See Strickler, 527 U.S. at 280-81; Josleyn, 206 F.3d at 153 (a Brady violation requires that the government either literally suppressed the evidence or should have known of its existence).  Neither of these conditions is satisfied here.  The citizenship application was not in the prosecution's files; the prosecution apparently had to get it from another agency not under its supervision in this case.  See United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (although individual prosecutors are presumed to have knowledge of information gathered by members of their office, they are not presumed to possess the  knowledge of persons employed by a wholly

-21-

separate government branch). The prosecution did not learn of the perjury until it examined the document for the first time -- well after the start of the trial.

The second Brady violation alleged by Cunningham involves the government's failure to turn over the testimony of witness Carlos Perez-Delgado from the 1999 trial. At the trial involved in this appeal, Carlos Perez-Delgado identified Cunningham as Rasta. Cunningham's counsel then asked the prosecution for any identifications of someone other than Cunningham as Rasta and the government represented, wrongly, that it had no such material. Cunningham's counsel was subsequently informed by counsel for another defendant that Perez-Delgado had testified at the earlier trial that Rasta was named "Bryan." Bryan Francis was admittedly involved in the organization, and, like Cunningham, worked for American Airlines in Miami and was black. Cunningham moved to dismiss for prosecutorial misconduct or to strike the in-court identification. The trial court denied the motion after the prosecutor asserted that he simply "ha[d] no recollection" of the inconsistent identification.

We will assume that the government should have disclosed this exculpatory information under Brady, even though the earlier transcript may have been available to defense counsel (there is no record of whether this was the case). We also assume that there was a witness statement from Perez-Delgado to the government,

covered by the Jencks Act, in which Perez-Delgado said that Rasta was someone named Bryan. We assume further, in the defendant's favor, that prejudice can occur under Brady even when the statement is disclosed immediately after the witness's direct examination and before cross-examination, in accordance with the Jencks Act.[2] 18 U.S.C. § 3500(a). Cunningham still cannot demonstrate a Brady violation because he was not prejudiced by the government's belated disclosure. Certainly Cunningham's cross-examination of the witness did not suffer from the belated disclosure: Cunningham's counsel cross-examined Perez-Delgado on his prior identification and got him to admit that he had previously testified under oath that Rasta was actually government witness Bryan Francis.

The question then is whether some other form of prejudice resulted from the government's failure to disclose earlier. Cunningham says that the late disclosure prejudiced his ability to persuade the court to stop Perez-Delgado from identifying him in

---

[2]There is an argument that Cunningham suffered no prejudice because, under the Jencks Act, he was entitled to the previous statement only after the direct examination of Carlos Perez-Delgado, which is when he received it. See 18 U.S.C. § 3500(a). This argument depends on the relationship between the Jencks Act and Brady. Other courts have noted this potential conflict between Brady and the Jencks Act, and have come to conflicting conclusions on the proper interplay of the two doctrines. Compare United States v. Bencs, 28 F.3d 555, 561 (6th Cir. 1994), with United States v. Snell, 899 F. Supp. 17, 21 (D. Mass. 1995). We do not enter this debate, as the issue can be resolved on alternative grounds.

court.  Understanding this issue requires a description of that in-court identification.

c.  In-court Identification Procedure

Cunningham argues independently that the government violated a pre-trial order by eliciting Perez-Delgado's in-court identification of him.  We deal with that claim and the claim of <u>Brady</u> prejudice together.  The government only provided notice that Perez-Delgado would be identifying Cunningham after Perez-Delgado had already given some of his testimony and had therefore seen Cunningham sitting with the three other defendants.  This, argues Cunningham, violated a pre-trial order requiring the government to provide advance notice of any in-court identifications so that the defendant could sit in the courtroom audience.

The district court correctly determined that the government's belated notice that Perez-Delgado was going to identify Cunningham as Rasta did not violate the pre-trial order. Cunningham had previously chosen not to sit in a different part of the courtroom when Thomas Martinez identified him as Rasta, and both the court and the government reasonably interpreted this as an indication that Cunningham also did not want to move to the back of the courtroom for future witness identifications.  Outside of the pre-trial order, Cunningham had no general right to sit in the courtroom audience during the in-court identification; the district court enjoys wide discretion in establishing procedures for such

identifications.  See 2 LaFave, Criminal Procedure § 7.4(g) (2d ed. 1999).

We turn back to the issue of whether, had Cunningham known of Perez-Delgado's earlier testimony identifying Rasta as Bryan, Cunningham could have persuaded the trial court not to permit the in-court identification.  There is no reason to think so.  In fact, this very argument was made to the trial court later and the court was unmoved.  As a result, the lateness in obtaining the information did not meet the Kyles prejudice test.

d. Error in Admission of DEA Agent Stoothoff's Conclusory Testimony About "the Organization"

(Segui-Rodriguez, Cunningham, and Casas)

Defendants Cunningham, Casas, and Segui-Rodriguez argue that there was reversible error in the admission of a portion of the testimony of Agent Stoothoff.  The objections were preserved. The government's misguided use of Agent Stoothoff to map out its case and to describe the role played by individual defendants raises a number of serious questions.

Agent Stoothoff, the first witness called by the government, began with admissible testimony based on his personal knowledge of observed events.  He testified about his involvement in the incident at the airport on March 21, 1994, and the search of the house at Villa Fontana later that day.

Stoothoff was then shown a document containing names and telephone numbers extracted from the Casio business organizer

seized at the house in Villa Fontana. When asked by the government what his investigation revealed as to these entries in the business organizer, Agent Stoothoff testified that they were names and numbers of members of the "organization," which he defined as the "drug trafficking group that was associated with Israel Perez-Delgado." He then explained that the entries for "Bert", "Felix" and "Rafael" referred to defendants Ralph Casas, Feliciano Nieves, and Rafael Segui-Rodriguez, respectively. Agent Stoothoff did not testify about any entry for Cunningham.

Agent Stoothoff proceeded to give a general description of his investigation after the arrests of Jose Velez-Roman, Hector Martinez-Medina and Jose Charluisant-Pagan, the three suspects at the airport on March 21, 1994. He testified that the DEA in Puerto Rico communicated with its counterpart in New York and with the New York police department and determined that several people whose names had come up in the Puerto Rico investigation were also wanted for questioning in New York. Officials in Puerto Rico and New York, he said, began communicating with each other on a regular basis about the case. Stoothoff also testified that the DEA in Puerto Rico, with the aid of several wiretaps in New York, learned of the scope of the organization and its basic methods for smuggling drugs into the country for distribution in New York.

The prosecutor then asked Agent Stoothoff to name individuals whom he had determined were members of the organization

in Puerto Rico. Stoothoff began listing a number of people, including Feliciano Nieves and Rafael Segui-Rodriguez.

Defense counsel for Cunningham objected on grounds of hearsay and that the witness was testifying as to the ultimate issue in the case. The hearsay objection was that Stoothoff was not testifying about his own investigation but rather about what he was told in post-arrest statements from individuals who, because they had been arrested, were no longer part of the conspiracy. The judge denied both objections and said that defense counsel could inquire whether Stoothoff was testifying on an ultimate issue in the case during cross-examination.

Later, Stoothoff was asked, "what did your investigation reveal as to members of the organization operating out of Miami, Florida?" Again, there were objections by defense counsels for Cunningham and Segui-Rodriguez, which the court again overruled. Agent Stoothoff then answered the question, saying "[t]here were Ralph Casas, . . . there were Bryan Francis, Winston -- well, at the time we knew the name of Rasta, we later identified that Rasta as being Winston Cunningham." Stoothoff also described the role that various individuals played in the organization and said that his "investigation reveal[ed]" that the organization moved more than 5,000 kilograms of cocaine and 1,400 grams of heroin between September 1992 and March 1995.

Stoothoff's conclusory testimony about the conspiracy and its members, it appears, was at least partially based on information provided by Israel Perez-Delgado, who cooperated after he was arrested. But Israel Perez-Delgado did not testify. Cunningham also objected on this basis to Stoothoff's testimony, and the court again rejected the objection.

In sum, Agent Stoothoff testified that there was a drug trafficking organization associated with Israel Perez-Delgado, that Cunningham was Rasta, that all four of the defendants were members of this organization, and that the organization handled specific massive quantities of cocaine and heroin. In doing so, he went well beyond his personal knowledge based on the airport incident and the search. Further, he did not differentiate the testimony that was based on personal knowledge from other sources of information, often hearsay. Nor did he present testimony about the characteristics of large-scale drug organizations in general. See, e.g., United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000). Instead, using the word "organization" rather than "conspiracy," he essentially testified that each of the defendants was guilty of the conspiracy charged. At oral argument,[3]

_____

[3]Although the government's brief includes in the Table of Contents a heading purporting to argue that Agent Stoothoff's testimony was permissible, the contents of the brief do not include any such argument. The brief does briefly address whether the testimony was hearsay in another section. This omission in the government's brief was brought up at oral argument and the government has made no attempt to correct the error. We are at a

-28-

government counsel wrongly characterized the agent's testimony as summary evidence.

Agent Stoothoff's testimony was fatally flawed for very basic reasons. It was not a summary of testimony admitted in evidence. Further, there is no indication that Agent Stoothoff's conclusions that the defendants were members of the drug organization were even based on testimony that was eventually presented at trial and could be evaluated by the jury. Agent Stoothoff merely said that his conclusions were based on the "investigation." In fact, Agent Stoothoff's testimony was likely, at least in part, based on the statements of a witness that the government chose not to call at trial; the record shows that the purported leader of the conspiracy, Israel Perez-Delgado, cooperated with the government and provided information. But Israel Perez-Delgado did not testify. The defendants had no chance to cross-examine him, did not know what he had said to the government, and had no basis to challenge a conclusion drawn from what he had said. If evidence does not exist in the record, the testimony can hardly be a summation of it. See United States v. Kayode, 254 F.3d 204, 211-12 (D.C. Cir. 2001) (error to permit government agent to give summary testimony where no foundation was ever laid). And, evidence which is based on inadmissible hearsay

loss to understand the government's indifference to a key issue in the case.

-29-

is itself inadmissible.  See Martin v. Funtime, Inc., 963 F.2d 110, 116 (6th Cir. 1992); Hackett v. Housing Auth., 750 F.2d 1308, 1312 (5th Cir. 1985).

In fact, Stoothoff was not even a summary witness attempting to summarize documents, Fed. R. Evid. 1006, or testimony (to the very limited extent that is ever permissible) already before the jury.  He was presented as a preliminary overview witness.  At least one other court, the Fifth Circuit, has condemned such "overview" testimony by a government agent presented at the outset of a trial.  United States v. Griffin, 324 F.3d 330, 349 (5th Cir. 2003).  The prosecution in that case called as its second witness an FBI agent, who testified broadly about the defendant's role in a tax-fraud conspiracy.  The testimony was based on the accounts of several witnesses that the government presented later in the trial.  In holding it was error to admit this preliminary overview testimony, the Fifth Circuit said that "[w]e unequivocally condemn this practice as a tool used by the government to paint a picture of guilt before the evidence has been introduced."  Id.

We agree with the Fifth Circuit that this initial witness "overview testimony" is inherently problematic: such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence.  See id.  There is also the

possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story.  Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.  Cf. U.S. v. Perez-Ruiz, No. 02-1466, 2003 U.S. App. LEXIS 25889, at *23 (1st Cir. Dec. 19, 2003) ("It follows inexorably" from the prohibition on vouching "that the prosecution cannot prop up a dubious witness by having a government agent place the stature of his office behind the witness.").  The fact that we and the Fifth Circuit have now had to address the government's use of such preliminary overview government agent witnesses is a troubling development.  The government should not knowingly introduce inadmissible evidence; it risks losing convictions obtained by doing so.

It is true that expert witnesses have leeway other witnesses do not.  In certain circumstances, expert witnesses are permitted to recount earlier evidence presented to the jury in the course of rendering an expert opinion.[4]  The Federal Rules of

---

[4]For instance, this court permitted an expert witness to summarize the testimony presented at trial in the course of calculating the income tax owed by a defendant facing tax evasion and drug charges. United States v. Sutherland, 929 F.2d 765, 779-80 (1st Cir. 1991).  That expert testified, after the other evidence had been admitted, that one possible source of the defendant's income was drug activities.  It was part of the government's case to show likely sources of income.  The testimony was explicitly based on testimony and evidence that the jury had

-31-

Evidence also allow experts, in certain circumstances, to rely on underlying facts or data which are not themselves admissible, <u>see</u> Fed. R. Evid. 703.

Agent Stoothoff's testimony is clearly not justified as expert summary testimony. Most obviously, Stoothoff was never introduced or qualified as an expert and even now the government does not claim he was an expert. More fundamentally, though, Agent Stoothoff's testimony that particular persons were members of the conspiracy was not an appropriate subject for expert testimony. It was not in any way linked to the "specialized knowledge" that Rule 702 requires. <u>See</u> <u>United States</u> v. <u>Johnson</u>, 54 F.3d 1150, 1157-58 (4th Cir. 1995) ("Rule [703] does not afford the expert unlimited license to testify or present a chart in a manner that simply summarizes the testimony of others without first relating that testimony to some 'specialized knowledge' on the expert's part as required under Rule 702 of the Federal Rules of Evidence."). As we explained in <u>United States</u> v. <u>Montas</u>, 41 F.3d 775 (1st Cir. 1994):

> Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the

---

heard and seen and the jury could decide for itself the likely source of income. <u>See</u> <u>id.</u>; <u>accord</u> <u>Yoffee</u> v. <u>United States</u>, 153 F.2d 570, 574 (1st Cir. 1946) (government accountant's testimony based on corporate ledger sheets that corporate transactions were not reflected as sales on books and tax returns was admissible, where defendant had access to ledger sheets and did not introduce the ledger sheets or object to the testimony on the ground that they were not in evidence).

> expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged.

Id. at 784. This is not like testimony that a defendant's fingerprints are on a weapon, for which specialized knowledge is required. This testimony threatened to usurp the role of the jury.

The admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict. See United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002). The government, not the defendants, bears the burden of establishing harmlessness. United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997). In conducting this inquiry, "[t]here is no bright-line rule"; the "harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue." United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993). The effects of the improper testimony vary by defendant.

Segui-Rodriguez

The error was harmless as to Segui-Rodriguez. Other evidence presented at trial, as well as the admissible testimony of Agent Stoothoff based on personal knowledge, clearly established

-33-

that Segui-Rodriguez was a member of the conspiracy. Agent Stoothoff saw Segui-Rodriguez driving the TransAm at the Puerto Rico Airport, and so identified him. A boarding pass with the name "Rafael Rodriguez" on it was found in the Isuzu Trooper that was impounded at the airport. Co-conspirator Hector Martinez-Medina, who was arrested during the incident at the airport, identified Segui-Rodriguez as the driver of the TransAm. Elizabeth Morales, who served as a frequent drug courier for the organization, testified that Segui-Rodriguez told her in March 1994 that he had just run into DEA agents at the airport and had fled, leaving behind 81 kilograms of cocaine. Segui-Rodriguez's presence next to the Isuzu that contained suitcases of cocaine, combined with his fleeing the scene when approached by the officers, strongly linked him to the overall conspiracy.

Multiple government witnesses all identified Segui-Rodriguez as an important figure in Israel Perez-Delgado's drug organization. Carlos Perez-Delgado testified that Segui-Rodriguez was the triggerman for the organization, the bodyguard of Israel Perez-Delgado, and was responsible for transporting firearms and surveillance equipment from Miami to Puerto Rico and New York.

Thomas Martinez, another former co-conspirator, testified in detail about Segui-Rodriguez's responsibility for guarding and preparing drug shipments. He described one instance in which Segui-Rodriguez assisted in transporting cocaine hidden in an audio

speaker to Israel Perez-Delgado's apartment in New York. Martinez testified that Segui-Rodriguez had three guns, including two semi-automatic pistols, with him during this incident. Martinez also described a second incident in which Segui-Rodriguez brought him and Israel Perez-Delgado to the house of Carlos Perez-Delgado, where 675 kilograms of cocaine was stored. Martinez said that Segui-Rodriguez and several others stood armed guard over the cocaine for about a week, using guns provided by Segui-Rodriguez and Israel Perez-Delgado. Segui-Rodriguez then assisted in transporting 360 kilograms of the cocaine into Carlos Perez-Delgado's van, and then out of the van and into the house of another co-conspirator, Freddy Melendez.

Elizabeth Morales confirmed that Segui-Rodriguez was generally present when the drugs were being distributed. She testified that Segui-Rodriguez would sometimes drive her to the airport after drugs had been strapped to her body, and that he was present at meetings between organization members at Israel Perez-Delgado's apartment in New York City. Vivian Santiesteban, another co-conspirator, also identified Segui-Rodriguez as a member of the organization, and described one occasion in which he helped package drugs and another in which he helped two mules escape police custody in Aguadilla. This evidence of guilt was overwhelming; the error in the agent's testimony was harmless as to Segui-Rodriguez.

Casas[5]

        Casas was also not harmed by the erroneous admission of Stoothoff's testimony. The evidence at trial firmly established that Casas played a major role in the organization; as such, it is highly probable that Stoothoff's conclusion that Casas was the leader of the Miami branch was the same determination that the jury would have drawn in the absence of the inadmissible testimony.

        Numerous witnesses testified that Casas was the leader of the organization's branch in Miami and played an active part in recruiting new members and coordinating their activities. For instance, Bryan Francis explained that Casas recruited him to help smuggle drugs past customs officials, promising him that he could "make some easy money." On multiple occasions, Casas paid Francis $2,500 to carry a suitcase containing cocaine from the employee-only part of the airport to the main terminal, thus bypassing security. At the direction of Casas, Francis would then give the drugs to a third person who took them with him on a plane headed to New York. Francis testified that Casas also recruited other American Airlines employees to assist.

        Elizabeth Morales testified that Casas directed American Airlines employees Francis and Rasta in schemes to smuggle cocaine

---

[5]Although it is not clear whether Casas joined in the objections of Cunningham and Segui-Rodriguez at trial, and he only minimally raises the issue of Stoothoff's testimony on appeal, we assume arguendo that the issue was preserved.

into the country.  Morales said that Casas explained to her a scheme in which she would fly from Puerto Rico to Brazil, with a stop-over in Miami.  The suitcases Morales checked in Puerto Rico would then be removed by organization members in Miami, before they ever went through customs.  The drugs were then snuck out of the airport and into waiting cars.

Witness Carlos Perez-Delgado confirmed this method of transporting drugs, and explained that "the group led by Ralph Casas" removed the suitcases containing drugs and redirected them to New York.  Casas was "the boss, the big guy in Miami, and he supervised the people who were working at Miami."  The testimony of Vivian Santiesteban, the wife of Carlos Perez-Delgado, buttressed this account.  Santiesteban described a meeting involving Casas, Israel Perez-Delgado, and Carlos Perez-Delgado, in which they discussed "using the contacts that they ha[d] inside American Airlines for the smuggling of the drugs."

The evidence showed that Casas's role went well beyond coordinating organization affiliates inside the airport; he was also actively involved in storing and transporting the drugs once they had been successfully smuggled past airport security.  Thomas Martinez testified that Casas delivered two suitcases of cocaine to Israel Perez-Delgado in Miami and loaded a duffle bag of cocaine into the car he was driving.  Martinez also said that Casas

accompanied him on at least one occasion to the airport to pick up shipments of cocaine.

Another government witness, Wilson Rodriguez, confirmed Casas's prominent role in storing drugs. Rodriguez testified that he picked up overnight shipments of cocaine that were sent to numerous post offices in the Miami area and drove them to Casas's apartment to be stored. Rodriguez also described delivering 100 kilograms of cocaine to Casas's house. Additionally, Carlos Perez-Delgado testified that Casas stored drugs in his apartment and was responsible for packaging those drugs and transporting them from Miami to New York.

Casas also occasionally coordinated the efforts of organization members outside of Miami. For instance, Martinez testified that Casas led several organization members on an expedition in Miami and Fort Lauderdale to purchase guns and bullet-proof vests. He also explained that after Israel Perez-Delgado was arrested, Casas helped organize a meeting of organization members in New York. Again, the evidence of guilt was overwhelming.

Cunningham

By contrast, the government has not borne its burden of showing that the improper admission of the evidence was harmless as to Cunningham. The evidence presented at trial clearly established that someone named "Rasta" was a member of the organization and

-38-

assisted Casas in switching the bags. The key question is whether Rasta is Cunningham or is someone else. The link between Rasta and Cunningham is not firm enough for us to conclude that it is highly probable that the error did not influence the verdict. Accordingly, we vacate Cunningham's conviction.

Aside from Agent Stoothoff, three witnesses -- Bryan Francis, Carlos Perez-Delgado, and Thomas Martinez -- identified Cunningham as Rasta. The strongest witness is Francis, who testified that he had met Rasta more than once or twice. Francis worked with Cunningham at American Airlines and testified that Cunningham moved suitcases filled with cocaine for Casas four times. Francis testified that he would give baggage information to Cunningham, who would then remove the bag from the ITI room so that Francis could pick up the bag, re-tag it, and move it to a room for luggage that had already been screened. However, Francis signed an affidavit saying that, to his personal knowledge, Winston Cunningham was not involved in the case. This was after Francis was arrested in connection with this case but before he had agreed to cooperate with the government. Cunningham also stated when he was arrested that some people at work called him "Rasta," but in his testimony denied any involvement in the organization.

The testimony of the other two witnesses that Cunningham was Rasta was less probative. Martinez and Carlos Perez-Delgado were each asked in court to identify Rasta -- whom witnesses had

testified was black -- and both identified the only black defendant in the courtroom, Cunningham.  Each witness had only met Rasta once or twice briefly some seven or more years earlier.  They may have, under the circumstances, mistakenly identified Cunningham, the only black defendant in the courtroom, as Rasta.

Carlos Perez-Delgado's identification of Cunningham as Rasta was based solely on a single meeting in September 1993 at the Miami airport, eight years before the trial.  Perez-Delgado testified that, during that meeting, Casas introduced Cunningham to him as Rasta, and that the three of them spoke about a missing suitcase of cocaine.  But this testimony is not consistent with Perez-Delgado's earlier testimony given in 1999, closer to the events at issue, that Rasta was a man named "Bryan."  Bryan Francis, the major witness to identify Cunningham as Rasta, also worked for American Airlines, moved bags of cocaine for Casas, and was black.

Thomas Martinez's identification of Cunningham as Rasta was based on only two encounters described at trial, both of which occurred about seven years prior to trial.  In the first encounter, Rasta stuck his head inside a van in which Martinez was sitting and said, "We can't find the suitcases."  This did not provide Martinez with a strong basis upon which to identify Cunningham seven years later.  The second encounter in which Martinez allegedly met Cunningham was a November 1994 meeting in New York during which

Casas suggested that he would take over Israel Perez-Delgado's position.  But this account conflicts with Bryan Francis's testimony that Casas only used Cunningham to move four bags and decided in January 1994 (ten months before the New York meeting) not to rely any further on Rasta.[6]

We cannot say that it is highly probable that the jury would have convicted Cunningham in the absence of Stoothoff's improper testimony.  Because we vacate Cunningham's conviction, we do not address any of his other liability or sentencing arguments.

e.  Speculative and Hearsay Testimony

   (Segui-Rodriguez, Casas)

   Segui-Rodriguez argues that the court improperly admitted overly speculative testimony from government witnesses Elizabeth Morales, Carlos Perez-Delgado, and Vivian Santiesteban.  But Segui-

_____

[6]Martinez's account of his second encounter with Cunningham also conflicted with his earlier trial testimony in 1999 of the 1994 meeting in New York, when he said who was in attendance but did not list Cunningham.  Cunningham did not learn about this testimony until after his conviction in this case.  He moved for a new trial, which was denied, apparently without an evidentiary hearing.  That denial of a new trial is an issue presented on appeal.  The denial was apparently based on the theory that a defendant is obligated to secure the earlier testimony of all the witnesses in a massive conspiracy trial once they are listed as prosecution witnesses.  The record is bare of needed facts, including whether the government ever indicated which of its witnesses would testify against which defendants and whether Martinez had made prior witness statements consistent with his 1999 testimony about the New York meeting but inconsistent with his 2001 testimony.
   Even without considering this claim, we would find that the error as to Cunningham was not harmless.  But this adds to our sense of unease about the verdict.

Rodriguez provides no discussion of this supposedly speculative testimony in his brief, and so has waived the argument. See Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 36 (1st Cir. 1994).

Segui-Rodriguez and Casas also contend that the district court improperly admitted several hearsay statements; only some of these statements implicate any hearsay issue. These include Martinez's testimony that Israel Perez-Delgado asked him to pick up cocaine in Florida and later told him that Segui-Rodriguez was almost caught by authorities at the Puerto Rico airport; Martinez's description of an incident in which Rasta told him that a suitcase of cocaine had been lost; and Morales's testimony about drug shipments that other mules had told her about. Finally, Segui-Rodriguez argues that a drug ledger that was admitted in evidence was hearsay. The drug ledger was a pad of paper on which Martinez had kept track of the money and cocaine that the organization brought to New York. Martinez testified about several specific entries recorded in the ledger, including one that indicated Segui-Rodriguez was paid $500.

Admitting these statements was error, argue Segui-Rodriguez and Casas, because the district court did not make any Petrozziello ruling. Under United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), the trial court must conclude that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the

statement was in furtherance of the conspiracy" before it admits hearsay pursuant to Fed. R. Evid. 801(d)(2)(E). Id. at 23.

Because none of the defendants objected to any of the alleged hearsay statements or requested a Petrozziello determination, review is for plain error. See United States v. Tom, 330 F.3d 83, 93 (1st Cir. 2003); United States v. Woods, 210 F.3d 70, 78 (1st Cir. 2000).

There was no plain error in the admission of any of the testimony that Segui-Rodriguez cites. With the exception of the drug ledger, the government presumably introduced in evidence the challenged statements under the theory that they were admissible non-hearsay pursuant to the co-conspirator exception in Fed. R. Evid. 801(d)(2)(E). See id. (statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy" are not hearsay). If Segui-Rodriguez or Casas wanted to argue this point, they should have done so at trial; it was certainly not plain error to admit the challenged statements under the government's uncontested theory that they were admissions by co-conspirators.

It was also not plain error for the district court to admit the drug ledger. If a ledger manifestly contains drug records, it is not hearsay if it is admitted in evidence merely for the purpose of showing the existence of a drug conspiracy. See United States v. Alosa, 14 F.3d 693, 696 (1st Cir. 1994). That

-43-

inference does not depend on the truth of the matters asserted in the ledger; even if the amounts of drugs and cocaine recorded in the leger are completely inaccurate, the ledger would still be probative of the existence of a drug conspiracy. See id. If, by contrast, the information in the ledger was admitted for the purpose of showing that Segui-Rodriguez was at one point owed $500 for his participation in the conspiracy, then the testimony would be hearsay. See id. Here, the court did not give the jury a limiting instruction on the evidentiary purposes for which the ledger could be used. But the failure to give a limiting instruction that was not requested by the parties certainly does not constitute plain error here. See United States v. Malik, 928 F.2d 17, 23 (1st Cir. 1991).

f.  Alleged Error in Testimony About Homicides

(Segui-Rodriguez)

Segui-Rodriguez argues that the district court failed to enforce its own ruling forbidding any reference at trial to two murders involving the organization. The only specific example of this failure that Segui-Rodriguez identifies is the trial judge's statement to the jury that the government, in exchange for witness Thomas Martinez's cooperation, agreed not to prosecute him for two murders. This statement resolved a conflict between the parties; while the defendants wanted to impeach Martinez with his plea agreement, they did not want to open the door to the government's

introduction of any testimony about the murders. As a compromise, the prosecution suggested that it would not introduce any evidence about the murders if the court, rather than the defendants, informed the jury about the government's plea agreement with Martinez. The court then asked each party whether this arrangement was acceptable. Counsel for Segui-Rodriguez indicated his approval.

Segui-Rodriguez specifically agreed to the court's statement at trial, and that ends the matter. See Freeman v. Package Mach. Co., 865 F.2d 1331, 1338 (1st Cir. 1988) ("the importance of a contemporaneous objection is at its zenith" for Rule 403 objections in view of the "balancing calculus which that rule demands"). Any objection was waived.

2. Presence of DEA Agent Stoothoff During Opening
   Arguments and Introduction of Defendants

   (Segui-Rodriguez)

At the beginning of the trial, the court introduced each of the defendants to the jury. During that time, Agent Stoothoff, who would testify as the first witness for the prosecution, was seated in the courtroom. Segui-Rodriguez, who did not object at the time, claims on appeal that it was error for the district court not to order, sua sponte, that Agent Stoothoff be sequestered prior to his testimony. As a result of this failure, according to Segui-Rodriguez, Agent Stoothoff's identification of Segui-Rodriguez as

the driver of the black TransAm at the Puerto Rico airport was indelibly tainted.

Because no objection was made, review is for plain error. See Ramirez-Burgos v. United States, 313 F.3d 23, 28-29 (1st Cir. 2002). Absent a request from counsel, the district court enjoys broad discretion in determining whether or not to sequester witnesses before their testimony. See United States v. De Jongh, 937 F.2d 1, 3 (1st Cir. 1991). Here, any prejudice to Segui-Rodriguez from Agent Stoothoff's presence during the defendants' introductions was minimal, at best; Agent Stoothoff saw Segui-Rodriguez at the airport and, in any case, was familiar with Segui-Rodriguez's appearance as a result of being involved with the investigation for a number of years. Segui-Rodriguez presents no reason to doubt this. Moreover, even when defendants do request that a witness be sequestered pursuant to Fed. R. Evid. 615, government counsel is permitted "to have an investigative agent at counsel table throughout the trial although the agent is or may be a witness." Fed. R. Evid. 615 advisory committee's note; see also United States v. Lussier, 929 F.2d 25, 30 (1st Cir. 1991). There was no plain error.

## C. Post-Trial Claims

1. Sufficiency of the Evidence

   (Casas and Segui-Rodriguez)

Casas and Segui-Rodriguez each challenge the sufficiency of the evidence presented at trial. In addressing whether there was sufficient evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003) (quoting United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998)). We draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government. United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995). The elements of a conspiracy charge include "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st Cir. 1990). The third element, voluntary participation, requires a showing of intent to agree to the conspiracy and intent to effectuate the object of the conspiracy. United States v. Ruiz, 105 F.3d 1492, 1499 (1st Cir. 1997).

Casas argues that the evidence presented at trial was insufficient to convict him because it consisted only of uncorroborated testimony of former co-conspirators and vague, conclusory statements by Agent Stoothoff. But even after discounting Agent Stoothoff's inappropriate testimony, there was

still sufficient evidence presented at trial to convict Casas. This evidence, discussed in detail in the harmless error analysis above, could allow a rational jury to conclude that Casas knowingly coordinated several members of a large organization directed at smuggling drugs into the continental United States and then selling them in New York. The jury was entitled to credit the co-conspirator testimony presented against Casas and to convict him on that basis. See United States v. Soto-Beniquez, 350 F.3d 131, 174 (1st Cir. 2003); United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000).

The evidence presented at trial was also sufficient to allow a rational jury to find Segui-Rodriguez guilty of conspiring to distribute narcotics.[7] This evidence was outlined above in the harmless error analysis. Segui-Rodriguez argues that, with the exception of the evidence concerning the incident at the Puerto Rico airport, all of the evidence presented against him at trial was "based on vague general and second-hand accounts" of his participation in the conspiracy. This characterization is incorrect. In addition to the evidence tying Segui-Rodriguez to the drugs seized at the Puerto Rico airport, the evidence included testimony about Segui-Rodriguez transporting and providing armed

---

[7]Segui-Rodriguez does not challenge the sufficiency of the evidence as to the second count of the Superseding Indictment, which charged him with aiding and abetting the possesion and distribution of approximately 81 kilograms of cocaine based on his involvement in the incident at the Puerto Rico airport.

guard for drug shipments to Carlos Perez-Delgado's house and to Israel Perez-Delgado's apartment in New York. The testimony also included specific testimony about Segui-Rodriguez packaging drugs, transporting mules to the airport, and attending meetings to discuss future drug shipments. This evidence was sufficient to allow a rational jury to convict Segui-Rodriguez.

2. Sentencing

a. Casas

In sentencing Casas, the district court determined that the base offense level was 38 because the conspiracy for which he was convicted involved over 150 kilograms of cocaine. See U.S.S.G. § 2D1.1. It then applied a two-level enhancement for possession of a dangerous weapon, a four-level enhancement for leadership role, and a two-level enhancement for violating a position of trust, arriving at a total offense level of 46. After reducing this offense level to 43, the maximum under the sentencing guidelines, the court sentenced Casas to life in prison. The sentencing judge was not the same judge who conducted Casas's trial.

Casas first argues that his sentence violated the rule of Apprendi v. New Jersey, 530 U.S. 466 (2000), because the jury did not determine the drug quantity distributed by the conspiracy. See United States v. Perez-Ruiz, No. 02-1466, 2003 U.S. App. LEXIS 25889, at *29 (1st Cir. Dec. 19, 2003). He also argues Apprendi error because the jury made no findings with regard to the

possession of a firearm in the conspiracy, Casas's leadership role in the conspiracy, or his abuse of a position of trust. These arguments are without merit. Contrary to Casas's assertion, the jury did make a specific drug quantity determination; the jury convicted Casas using a special verdict form on which it found that the conspiracy distributed 9,445 kilograms of cocaine. See id. at *31 ("The jury's findings would be readily ascertainable if the court had required it to complete and return a special verdict form.").

As to the sentencing enhancements for firearms possession, leadership role, and abuse of a position of trust, Apprendi does not require that the jury make any determinations on these questions; the statutory maximum for Casas was life imprisonment. See 21 U.S.C. §§ 841(b)(1)(A), 846 (conspiracy involving at least five kilograms of cocaine triggers a maximum sentence of life imprisonment for all co-conspirators). The additional enhancements do not implicate the rule of Apprendi. See United States v. Lopez-Lopez, 282 F.3d 1, 22 (1st Cir. 2002) ("Apprendi's prohibition applies only when the disputed fact enlarges the applicable statutory maximum and the defendant's sentence exceeds the original maximum." (internal quotations omitted)).

Casas separately argues that his Fifth Amendment rights were violated when he was sentenced by a judge who did not preside

at his trial.  Casas recognizes that Fed. R. Crim P. 25(b) permits any judge regularly sitting in a court to replace a trial judge who is unavailable after a guilty verdict.  He argues, however, that the successor judge in this case was not sufficiently familiar with the record to make the factual determinations underlying his sentencing enhancements.  As evidence of the successor judge's lack of familiarity with the record, Casas observes that the judge was only given the trial record four days before the sentencing determination.  Casas also notes that the successor judge failed to correct the prosecutor's statement that Casas had asked Martinez to protect his nephew; the testimony was actually that Casas had sought protection for his brother-in-law.

Rule 25(b) recognizes that in certain instances a judge who inherits a case at the post-verdict stage may not be sufficiently familiar with the case to sentence the defendants without conducting a new trial.  Fed. R. Crim. P. 25(b)(2)(A); United States v. Colon-Munoz, 318 F.3d 348, 355 (1st Cir. 2003).  Normally, however, such measures are not necessary because a replacement judge is "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record."  Colon-Munoz, 318 F.3d at 355 (quoting United States v. Bourgeois, 950 F.2d 980, 988 (5th Cir. 1992)).  Successor judges need not explicitly state their familiarity with the record.  Their

(often implicit) determinations that they are sufficiently familiar with the record are reviewed for abuse of discretion. Id.

Casas has not established that the successor judge abused his discretion in taking over the case without ordering a new trial. During the sentencing hearing, the judge displayed ample knowledge of the testimony presented at trial. Casas's arguments to the contrary are entirely unpersuasive. The judge's silence during the prosecutor's minor misstatement of the evidence does not demonstrate that the judge was unaware of the error, much less that he was not sufficiently knowledgeable about the case to render a fair sentence.

Casas's final challenge to his sentence is that there was insufficient evidence to support the court's enhancement of his sentence under U.S.S.G. § 3B1.1(a). To justify this enhancement, the government must show by a preponderance of the evidence that the defendant was an "organizer or leader" of the criminal activity. See United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997). Review is for clear error. See United States v. May, 343 F.3d 1, 7 (1st Cir. 2003). Casas suggests that the government did not meet its burden here because the evidence at trial established that Casas was subordinate to Israel Perez-Delgado in the organization.

This argument is unpersuasive. The mere fact that Casas was subordinate to Israel Perez-Delgado does not establish, without

more, that Casas was not an organizer or leader of the conspiracy. See U.S.S.G. § 3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."). Rather, the sentencing guidelines list multiple factors for determining whether a defendant is a leader or organizer. United States v. Robbio, 186 F.3d 37, 45 (1st Cir. 1999).[8]

The district court did not commit clear error in finding that Casas was an organizer or leader of the conspiracy. Numerous witnesses testified that Casas was the leader of the group in Miami. The evidence indicated that Casas recruited Bryan Francis and Rasta to assist in smuggling cocaine past customs officials. He coordinated the efforts of both recruits, telling them where and when to pick up the drugs and to whom it should be delivered. He then paid them thousands of dollars for their assistance. Casas also led several members of the organization in a coordinated effort to purchase firearms in Miami. And when Israel Perez-

---

[8]These include (1) whether the defendant exercised decision-making authority; (2) the nature of his participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, cmt. n.4. None of these factors is dispositive; rather, the test is multi-faceted and requires weighing the evidence as a whole. See United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

Delgado was arrested, Casas sought to take control of the entire operation.

b. Nieves

Nieves challenges the district court's imposition of a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon.  He argues that there was no evidence that he knew or should have known that other members of the organization possessed a weapon in connection with the conspiracy.  Because Nieves challenges the district court's application of the guidelines to the facts, review is for clear error.  May, 343 F.3d at 7.  The enhancement for possession of a dangerous weapon requires that it was reasonably foreseeable that a co-conspirator would possess a gun in furtherance of the criminal activity.  United States v. Mena-Robles, 4 F.3d 1026, 1036 (1st Cir. 1993).  The defendant need not have himself possessed the weapon.  See United States v. Berrios, 132 F.3d 834, 839 (1st Cir. 1998).  Here, Thomas Martinez testified that Nieves helped him, Segui-Rodriguez, and Ray Cabassa guard 675 kilograms of cocaine that was stored at Carlos Perez-Delgado's house.  The four of them guarded the cocaine for approximately one week and Martinez testified that both he and Segui-Rodriguez carried guns in the process, including a small semiautomatic machine gun.  It was not clear error for the district court to credit this testimony and conclude that, in the course of guarding cocaine with two other

armed individuals for over a week, Nieves both knew of and could reasonably foresee his co-conspirators' possession of firearms. Cf. <u>United States</u> v. <u>Sostre</u>, 967 F.2d 728, 731-32 (1st Cir. 1992) (enhancement affirmed where co-defendant physically possessed gun and defendant assisted him in protecting drugs).

**IV.**

The convictions and sentences of Rafael Segui-Rodriguez, Ralph Casas, and Feliciano Nieves are **<u>affirmed</u>**.  Winston Cunningham's conviction is **<u>vacated</u>**.