# United States Court of Appeals
## For the First Circuit

Nos. 05-2163 and 06-1317

UNITED STATES OF AMERICA,

Appellee,

v.

TIMOTHY J. DUVAL and MICHAEL R. DOUCETTE,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Circuit Judge,
Selya and Cyr, Senior Circuit Judges.

Miriam Conrad, Federal Defender Office, was on brief, for appellant Doucette.
John J. Barter, was on brief, for appellant Duval.
Claire J. Evans, Criminal Appellate Section, U.S. Department of Justice, with whom Michael J. Sullivan, United States Attorney, and John A. Capin, Assistant United States Attorney, were on brief, for appellee.

August 7, 2007

**TORRUELLA**, **Circuit Judge**. Timothy J. Duval and Michael R. Doucette were each convicted of one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Duval and Doucette now appeal their convictions and sentences. After careful consideration, we affirm.

## I. Background

On January 27, 2003, Heath Woodward, then a resident of Sanford, Maine, reported that his 1996 maroon Buick was stolen from a convenience store parking lot. Woodward later testified that he did not have any weapons in the car at that time.

In late January, Duval, Doucette, and Carlos Ramos (an acquaintance of Duval and Doucette) spent a few nights at an apartment rented by Robert Dyott. Dyott was an associate of Ramos and unbeknownst to his guests, an informant for the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Dyott would later testify that while staying at his apartment, Doucette said that he and Duval had stolen a car from a convenience store and that they had some weapons in the trunk of that car that they wanted to "move" (i.e., sell). Dyott also testified that Duval and Ramos were in the room when Doucette said this, and that Duval did not disavow Doucette's statement. According to Dyott, Doucette also said that he and Duval were going to stay at a hotel the following night.

On January 31, 2003, a guest identifying himself as "Carlos Ramos" registered at the Chelmsford Best Western for

-2-

himself and a guest named "Paul Santos." They were assigned room 102. In filling out the registration form, "Ramos" identified his car as a "96 maroon Buick." That same night, a call was placed from Room 102 to a cell phone provided to Dyott by the ATF.

On February 1, 2003, Dyott spoke with Daniel Meade, an ATF Agent, and told him that there was a stolen car with weapons at the Chelmsford Best Western. The ATF notified the Chelmsford police department, which sent Officers Tyros and Tine, joined by Agent Meade, to the Best Western to investigate the suspected stolen vehicle. Officer Tyros watched as a Caucasian male, later identified as Duval, walked toward a maroon Buick carrying a black object, and paused briefly by the trunk of the car. Tyros testified that Duval noticed his presence and walked back to room 102.

Later that day, Agent Meade encountered Duval and Doucette as they walked towards a gas station near the motel and asked them to identify themselves. Upon learning their identities, Agent Meade arrested Duval and Doucette on outstanding warrants. Meade found the keys to the stolen Buick in Doucette's front pocket. A search of the car revealed a Remington rifle, a Remington shotgun, a Marlin rifle, and ammunition inside the trunk. Investigators found no fingerprints in the trunk, on the firearms, or the ammunition. However, Duval's and Doucette's prints were recovered from objects found in the passenger compartment.

-3-

On June 19, 2003, a complaint was filed with the United States District Court for the District of Massachusetts charging Duval and Doucette each with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The Government filed an indictment against Duval and Doucette on September 3, 2003. Both Duval and Doucette pleaded not guilty.

In an attempt to comply with Local Rule 116.1(c)(1) and Brady v. Maryland, 373 U.S. 83 (1963), the Government initially disclosed to Duval and Doucette in October 2003 that it would call Dyott to testify at trial, and that Dyott was a Government informant. The Government stated that Dyott had not been paid for his cooperation and that there was no evidence that would otherwise cast doubt on his credibility. But two months later, the Government informed Duval and Doucette that Dyott had been paid $5,150 for his cooperation since 1998. Then, in February 2004, the Government sent a letter to Duval and Doucette stating that in 1998, it had dropped firearms charges against Dyott in exchange for his cooperation. Eight months after that, the Government added that it had discovered that Dyott had been paid an additional $600 in 1998 and 1999, and that Dyott had a long history of mental illness.

On January 10, 2005, the Government moved to supplement its witness list to include Carlos Ramos, the acquaintance of Duval and Doucette who had allegedly rented the motel room for them. The

Government disclosed in a letter to Duval and Doucette that Ramos had a history of drug abuse, and had once cooperated with the Government by making a "controlled buy." The following week, on January 19, the Government sent a second letter to Duval and Doucette stating that Ramos had told the Government that he did not see any guns or hear either defendant make any reference to guns, and that Ramos had told Agent Meade in 2003 that he had no knowledge of a stolen car. Other than this disclosure, the Government indicated that it had no additional exculpatory information regarding Ramos.

Two days later, on January 21, 2005, the Government sent another letter to Duval and Doucette. This time, the letter stated that the Government did have exculpatory information regarding Ramos, specifically that Ramos was offered leniency for his participation in the firearms transaction in exchange for becoming an informant. The letter also stated that Agent Meade had interviewed Ramos in February 2003, but that Meade had not made any notes of the interview. The letter stated that Meade had asked Ramos about his renting a hotel room for Duval and Doucette, but that he did not recall if he asked Ramos whether he was in the room with Dyott, Duval, and Doucette in late January when Doucette was alleged to have offered to sell Dyott weapons. The Government continued to assert that Ramos had not been paid for his cooperation on the Duval and Doucette case. On January 31, 2005,

the Government sent yet another letter to Duval and Doucette, amending its prior disclosure to add that Ramos had in fact attempted to make at least three or four controlled purchases for the ATF, and that Meade had given him money to buy telephone calling cards. On the sixth day of the trial -- February 14, 2005 -- the Government disclosed to Duval and Doucette, seemingly contrary to prior claims that Ramos had not been paid in connection with the present case, that an entry on the ATF payment roster indicated that Ramos had been paid $50 for "informant subsistence." The entry included a reference to "Ducette [sic] & Duval."

Duval and Doucette moved to dismiss the indictment because of a pattern of Government non-compliance with its disclosure obligations. The Government opposed the dismissal of the indictment, contending that neither Duval nor Doucette had suffered prejudice as a result of the belated disclosures. The court denied the motion to dismiss, stating that the Government had violated its Brady obligations, but that neither Duval nor Doucette were prejudiced.

Duval and Doucette also requested that the Government provide the records of each individual payment to Dyott and Ramos so they could determine if the Government had failed to disclose any other payments to the witnesses. Instead, the Government provided Duval and Doucette a summary of the payments made to Dyott. Duval and Doucette claimed that the summary was

-6-

insufficient given the history of belated disclosures by the Government, and asked the court to compel production of the payment records, or in the alternative, to review the records in camera, in order to determine whether any additional payments had been made to Dyott or Ramos.  The court denied the request.[1]

In addition, Duval moved to exclude as inadmissible hearsay Dyott's testimony that Doucette had offered firearms for sale.  The court denied Duval's motion to exclude without prejudice, ruling that he could raise it again at trial if the Government failed to show that Doucette's statement was either a statement in furtherance of a conspiracy or an adoptive admission by Duval.

The jury trial of Duval and Doucette began on February 7, 2005, and lasted eight days.  At trial, Dyott testified that he had met with Duval, Doucette, and Ramos in late January, that Doucette had told him that he had firearms to sell, and that Duval said nothing when he heard this.  Dyott also disclosed on direct examination his past and present drug habits, mental illness, and criminal history.  Duval and Doucette cross-examined Dyott as to his cooperation with the ATF and payments that he received.  In addition, both Ramos and Agent Meade testified, along with various other witnesses.

---

[1]  The request was made prior to trial and was renewed after the Government's additional disclosure of exculpatory evidence on February 14, 2005.

-7-

During closing arguments, the Government noted that Duval had been within fifteen miles of the location where the Buick was stolen, that the Buick did not have firearms or ammunition in it when it was stolen, that the Buick was later found at the hotel where Duval and Doucette were staying, that Duval had suspiciously approached the vehicle but turned away when he saw the police, that Doucette had the keys to the vehicle, and that the trunk contained firearms and ammunition. The Government then stated, "[Y]ou can stop right there . . . because that evidence proves beyond a reasonable doubt that [Duval and Doucette] were in knowing possession [of the firearms and ammunition]. But there's more." The Government then noted that Dyott had testified that Doucette had admitted to possessing the firearms, and that Duval had remained silent. The Government acknowledged Dyott's substantial credibility problems but said, "Take Mr. Dyott's testimony, discount it altogether. . . . [T]here is still no reasonable doubt that these men possessed those guns and that ammunition." Duval and Doucette then gave their closing arguments. Duval suggested that "the Government cannot get around the testimony of Robert Dyott. [If] Robert Dyott's testimony [is] not in this case, there is no case." Doucette stated, "[I]f you don't believe Mr. Dyott's testimony about a conversation he claims to have heard January 31st of 2003, if you don't believe his testimony beyond a reasonable doubt, you cannot convict in this case."

Duval and Doucette then asked the court to give two instructions to the jury. First, they asked the court to instruct the jury that, "if [you] do not believe Mr. Dyott's testimony beyond a reasonable doubt [about his alleged conversation with Doucette], [you] must acquit the defendant." Second, Duval and Doucette asked the court to instruct the jury that "[o]ne cannot be found guilty of possessing an object unless he has knowledge of its presence. Knowledge alone, however, is not enough to prove possession. Similarly, mere presence in the vicinity of the object is insufficient to prove possession." The court refused both instructions, and instead instructed the jury as follows:

> To possess something means to have control or dominion and control over something. It is not necessarily the same as legal ownership.
>
> The law recognizes different kinds of possession. Possession includes both actual and constructive possession. A person who has direct, physical control of something on or around his person is in actual possession of it. A person who is not in actual possession but who has the -- both the power and intention to exercise control or dominion and control over something is in constructive possession of it. So whenever I use the word "possession" in these instructions, I mean both actual and constructive possession.
>
> In considering the issue of possession in this case it is not necessary for you to conclude that a defendant in this case was in actual or constructive possession of the firearm and/or ammunition for a specified period of time.
>
> More than one person can have control over the same firearms and/or ammunition. If this is so, then these people have what is called

-9-

joint possession. For purposes of determining a defendant's guilt, joint possession is not different from sole possession.

While you may consider a defendant's proximity to the firearms and/or ammunition in deciding whether the government has established beyond a reasonable doubt that he possessed those items, mere proximity to the firearm and/or ammunition or mere presence of a defendant in the place where the firearm and/or ammunition were found is insufficient by itself to support a finding of possession.

. . .

The Government must also establish beyond a reasonable doubt as to each defendant that he knowingly possessed the firearms and/or ammunition in question. The word "knowingly" means that the act was done voluntarily and intentionally and not because of ignorance, mistake, or accident. Thus, in order to convict a defendant, you must find beyond a reasonable doubt that he knew he was in possession of a firearm and/or ammunition and that he knew that what he possessed was a firearm and/or ammunition as we commonly use these words.

The jury convicted both Duval and Doucette on the sole count of being a felon in possession of a firearm. Presentence reports were prepared for both defendants, suggesting that they were subject to the Armed Career Criminals Act ("ACCA"), 18 U.S.C. § 924(e), which imposes a mandatory minimum sentence of fifteen years on any person convicted of a firearms charge who has been previously convicted of three violent felonies. Neither Duval's nor Doucette's prior convictions were alleged before the jury, and the jury made no finding as to them.

-10-

Both Duval and Doucette challenged the court's ability to impose a sentence under the ACCA unless the predicate convictions had been proven to a jury. In addition, Duval stated that one of the predicate convictions being used to support his eligibility for an ACCA sentence, a conviction for assault and battery under Me. Rev. Stat. Ann. tit. 17-A, § 207(1)(A), was neither a violent crime nor a felony. The court rejected Duval's and Doucette's arguments and found them both to be subject to the ACCA because they had each been convicted of three prior felonies. The court imposed a sentence of 180 months on Duval and 204 months on Doucette.

## II. Discussion

Duval and Doucette appeal their convictions on the ground that the Government failed to meet its obligation to disclose exculpatory evidence under Brady, 373 U.S. 83, and the Jencks Act, 18 U.S.C. § 3500(b). In addition, Duval argues that Dyott's testimony as to Doucette's statement during the January 30, 2003 meeting should not have been admitted against him because it was inadmissible hearsay. Duval and Doucette both challenge the district court's failure to give their requested jury instructions regarding the elements of constructive possession and the sufficiency of the evidence against them. Duval and Doucette also bring a Sixth Amendment challenge to their ACCA-mandated sentences. Finally, Doucette argues that he has not been convicted of three

-11-

violent felonies, and thus is not subject to sentencing under the ACCA.  We discuss each of these claims in turn.

## A. **The Government's Disclosure Obligations**

Duval and Doucette argue that the Government failed to comply with its obligations under Brady and the Jencks Act to disclose exculpatory and impeaching evidence regarding Dyott and Ramos and that it should have been sanctioned accordingly.  In addition, because of the belated disclosure that Ramos had been paid for his cooperation with the ATF, Duval and Doucette suggest that the Government may have failed to disclose additional payments made to Dyott and Ramos, and they argue that they were entitled to in camera review of the Government's records of payments to confidential informants.  We review the district court's denial of sanctions and in camera review for abuse of discretion.  See United States v. Rosario-Peralta, 175 F.3d 48, 55 (1st Cir. 1999); United States v. Devin, 918 F.2d 280, 289 (1st Cir. 1990).

In Brady v. Maryland, the Supreme Court held that a prosecutor has a duty to disclose, upon request, "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87; see also Giglio v. United States, 405 U.S. 150, 154 (1972) (reversing a conviction where the Government failed to disclose that it had granted immunity to a witness upon whose testimony the Government's case

-12-

was heavily dependent). Likewise, under the Jencks Act, the prosecution has an obligation to "provide, upon request, certain prior statements made by trial witnesses . . . that . . . 'relate[] to the subject matter as to which the witness has testified.'" United States v. Schneiderhan, 404 F.3d 73, 79 (1st Cir. 2005) (citing 18 U.S.C. § 3500(b)). To vacate a conviction because of a Brady violation, a defendant must show that "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." United States v. Casas, 356 F.3d 104, 114 (1st Cir. 2004) (quoting United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000)). The test for a Jencks Act violation is similar; we look to see whether the Government failed to disclose prior statements by witnesses that relate to their testimony at trial, and whether the nondisclosure was prejudicial. Schneiderhan, 404 F.3d at 79. "When the issue is one of delayed disclosure rather than of nondisclosure, however, the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986); see also United States v. Arboleda, 929 F.2d 858, 864 (1st Cir. 1991) (applying Ingraldi to allegations that the Government belatedly disclosed Jencks Act materials).

-13-

We begin by noting that the Government's conduct during the course of this prosecution was a clear violation of its Brady and Jencks Act obligations. The Government "amended" its disclosures of potentially exculpatory evidence no less than five times, each time disclosing information that further cast doubt on the testimony of Dyott and Ramos, two of the Government's principal witnesses at trial. At least part of the problem appears to have been that the ATF agent involved in the investigation kept scant notes on conversations with Ramos that tended to exculpate his prime suspects, Duval and Doucette -- a practice whose propriety is questionable.[2] Another part of the problem appears to have been shoddy record-keeping by the ATF with regard to payments to confidential informants. Finally, overly broad statements by the Government that all exculpatory information had been disclosed may have led Duval and Doucette to believe that the Government had in fact disclosed all that it knew, when it had not. Whether the late disclosures were the product of happenstance or of negligence is unclear, but we take this opportunity to remind prosecutors that disclosure of Brady and Jencks Act material is not a suggestion, but a constitutional and statutory obligation.

---

[2] Cf. United States v. Houlihan, 92 F.3d 1271, 1289 (1st Cir. 1996) ("Eschewing tape recordings and ordering law enforcement agents not to take notes during pretrial interviews is risky business -- and not guaranteed to redound either to the sovereign's credit or to its benefit. By adopting a 'what we don't create can't come back to haunt us' approach, prosecutors demean their primary mission: to see that justice is done.").

We are mindful that not all convictions must be vacated because of non-compliance with disclosure obligations; we must also determine whether the late-disclosed information prejudiced Duval and Doucette's ability to present their case. The first set of evidence belatedly disclosed by the Government was impeachment evidence regarding Dyott, namely that he had been treated for mental illness and had been paid $5,750 and given leniency in a prior case in exchange for his services as a confidential informant. This information falls within the purview of Brady because it could be used to impeach the reliability and motivation of Dyott's testimony. However, the last of these disclosures occurred in October 2004, nearly six months before the start of the trial. This left sufficient time for Duval's and Doucette's counsel to incorporate the information into their defense strategy. While we do not condone the lateness of these disclosures, we do not find that the district court abused its discretion in determining that the lateness did not prejudice Duval and Doucette in the preparation of their cases, and that sanctions were not warranted.

The second set of late disclosures involved statements by Ramos to Agent Meade that he had not heard Dyott and Doucette discussing the arms sale; this statement falls within the scope of material that must be disclosed under Brady because it casts doubt on both the Government's claim that the conversation occurred, and

-15-

the claim that Duval heard the statement and adopted the implicit admission of criminal activity by remaining silent. It also falls within the ambit of the Jencks Act, as it is a prior statement by a witness that relates to his trial testimony. However, as the Government points out, Ramos remained missing until January 2005, and it is unclear that Duval and Doucette could have located him before then. Furthermore, Ramos admitted during cross-examination that he had told Meade that he did not remember hearing anything about the sale of arms at the motel, and that he did not tell Meade anything about the stolen car when they met in February 2003. Thus, even assuming that Doucette and Duval could have located Ramos before that time and interviewed him regarding his statement, it is unclear what benefit this would have been to the defense strategy. See Casas, 356 F.3d at 115 (finding no prejudice where defense counsel had an opportunity to cross-examine witness about belatedly disclosed cooperation agreement). Again, we do not find that the district court abused its discretion in determining that neither Duval nor Doucette were prejudiced by the late disclosure of Ramos's statement, and thus that sanctions were therefore not warranted.

Finally, Duval and Doucette point to the mid-trial disclosure that the Government may have paid Ramos $50 in connection with his cooperation in another case. The Government has stated that it has no further records of payment, but Duval and

Doucette, having observed a pattern of delayed disclosures, suggest otherwise. Thus, Duval and Doucette suggest that the proper remedy for this late disclosure is to give them the opportunity to examine the Government's confidential informant payment records to determine if other payments have been made to Ramos.[3] In the alternative, Duval and Doucette propose that we direct the court to engage in an in camera review of the records to determine whether additional exculpatory material exists. Duval and Doucette suggest that their case is similar to United States v. Rosario-Peralta, 175 F.3d 48 (1st Cir. 1999). In that case, various Government agencies had been pursuing a boat at sea that was observed dumping drugs overboard. Id. at 50-51. The principal defense theory was that the pursuing vessels had lost track of the boat engaged in the dumping, and that they had mistakenly seized the defendants' boat instead. Id. at 55. Accordingly, the defendants requested communication logs from the Government, which they argued would conclusively establish that their boat could not have been the same boat observed dumping drugs overboard. Id. at 54. We noted that the information in the logs was "critical to defendants' theory and was a disputed issue at trial," and that "we do not see how [the logs] could fail to be relevant." Id. at 55. Thus, we ordered in

---

[3] Assuming that they found additional exculpatory information, Duval and Doucette argue that they would be entitled to a new trial or dismissal of the indictment altogether.

camera review of the logs to determine whether they contained potentially exculpatory evidence.  Id. at 57.

Two principal differences between the present case and Rosario-Peralta support our conclusion that the district court did not abuse its discretion in failing to order in camera review of the Government's payment logs.  First, the defendants in Rosario-Peralta made a clear showing that the evidence they sought in fact existed; the Government had acknowledged the existence of the communication logs and that they dealt with the defendants' case, but had argued that they were cumulative of other evidence presented.  Here, Duval and Doucette have merely postulated a theory that additional records of payment to Ramos or Dyott exist; albeit a theory that was fostered by the Government's pattern of non-disclosure.  While we emphasize that the Government's denial that additional Brady or Jencks Act material exists is not dispositive to our analysis, Duval and Doucette have not done much better than to take a shot in the dark.  This is insufficient to establish the likelihood of a Brady violation, United States v. Caro-Muñiz, 406 F.3d 22, 30 (1st Cir. 2005), and as such is certainly insufficient to require in camera review.

Second, the material sought in Rosario-Peralta was undisputably directly relevant to the key issue in the case: the tapes would either potentially reveal that the defendants' boat had been the one pursued or that the Government had, in fact, lost

-18-

track of the boat in question.  In Duval and Doucette's case, even if there were an adequate showing that records of additional payments made to Ramos or Dyott existed, they would not bear directly on the guilt or innocence of either defendant.  Although the records would have some utility as impeachment evidence, Duval and Doucette were already aware that Ramos and Dyott had accepted payments from the ATF.[4]  Thus, the records would have been cumulative of other evidence, and it is unclear that their addition would have "put the whole case in such a different light as to undermine confidence in the verdict."  Casas, 356 F.3d at 114.  Accordingly, the court did not err in denying Duval and Doucette's request to review the Government's records.  See United States v. Nelson-Rodríguez, 319 F.3d 12, 35 (1st Cir. 2003) (holding that neither Brady nor the Jencks Act "provides grounds for relief unless the exclusion or failure to produce prejudiced [the] defense").

In short, while we disapprove of the practice of belated disclosures of Brady and Jencks Act material, we do not find that the Government's conduct in this case was so prejudicial that the district court abused its discretion in denying sanctions.

---

[4]  Our belief that Duval and Doucette were not prejudiced is bolstered by the fact that the known payments to Ramos were not used to impeach him at trial.

-19-

## B.  **Use of the Adoptive Admission Against Duval**

Duval's next claim of error concerns the district court's decision to admit against him the testimony of Dyott, who claimed that Doucette said that he and Duval wanted to sell firearms in their possession.  The Government claimed that Dyott's testimony implicated Duval because Duval was present when the incriminating statement was made yet did not attempt to disassociate himself from it, and thus was admissible as an adoptive admission by an opponent party.  See Fed. R. Evid. 801(d)(2)(B).[5]  On January 27, 2005, Duval filed a written motion to exclude the use of Dyott's testimony as inadmissible hearsay.  On February 4, 2005, the district court denied Duval's pretrial motion without prejudice to its renewal during trial.  At the Government's request, the statement was admitted at trial.

While the admissibility of evidence is ordinarily reviewed for abuse of discretion, United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006), we review the case at bar for plain error because Duval "failed to interpose a contemporaneous objection" at trial.  Udemba v. Nicoli, 237 F.3d 8, 16 (1st Cir. 2001); see also United States v. Desimone, No. 05-2314, 2007 WL 1633556 at *5 (1st Cir. June 7, 2007) (reviewing the admission of hearsay for plain

---

[5]  The Government also claimed that Doucette's statement was admissible as a statement in furtherance of a conspiracy.  Because we find this statement admissible as an adoptive admission, we need not reach this issue.

error).  "Under the plain error standard, an appellant must demonstrate that (1) there was an error; (2) the error was plain; and (3) the error affected substantial rights."  United States v. Tom, 330 F.3d 83, 93 (1st Cir. 2003) (quoting Johnson v. United States, 520 U.S. 461, 466-67 (1997)).  In addition, the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."  Id. (quoting Johnson, 520 U.S. at 466-67).

We have long recognized "so-called adoptive admissions, including admissions by silence or acquiescence," as admissible against a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(B).  United States v. Fortes, 619 F.2d 108, 115 (1st Cir. 1980).  In United States v. Miller, we elaborated, stating that "a party's agreement with a fact stated by another may be inferred from (or 'adopted' by) silence . . . when (i) a statement is made in a party's presence, (ii) the nature of the statement is such that it normally would induce the party to respond, and (iii) the party nonetheless fails to take exception."  478 F.3d 48, 51 (1st Cir. 2007).  Alleged admissions by silence may be properly submitted to the jury only if "a reasonable jury could properly find the ultimate fact in favor of the proponent of the evidence."  United States v. Barletta, 652 F.2d 218, 219 (1st Cir. 1981).

In the present case, Dyott testified as to the incriminating nature of Doucette's statement and placed Duval at

the scene of the conversation. Duval argues that these foundational facts -- which were proffered by the Government -- were insufficient to prove that he heard the statement, and thus for it to be admitted as an adoptive admission. While in some cases, the paucity of facts introduced at trial precludes any reasonably grounded finding of actual acquiescence, see, e.g., United States v. Moore, 522 F.2d 1068, 1076 (9th Cir. 1975), we have left the resolution of substantial yet conflicting testimony for the jury, see, e.g., United States v. Wiseman, 814 F.2d 826, 829 (1st Cir. 1987). This same principle applies to cases in which the facts give rise to conflicting but plausible inferences.

In the present case, the trial court properly found that the Government laid an adequate foundation for the admission of Dyott's testimony by offering testimony that the conversation between Dyott and Doucette took place in a small room, and that Duval was in that room, testimony from which it could be reasonably inferred that Duval heard Doucette's statements. Although Duval offered the contrary testimony of Ramos, who stated that he did not hear the conversation between Dyott and Doucette, the ultimate question of whether to believe Ramos's testimony and to infer from it that Duval also did not hear Doucette was properly left to the jury. Because the court properly found that a foundation existed for the admission of Dyott's testimony against Duval, we see no

-22-

basis for concluding that the district court erred, plainly or otherwise, in admitting his testimony against Duval.

## C. **Instructional Errors**

Duval and Doucette argue that the court erred in denying their request for two jury instructions. First, Duval and Doucette contend that the court erroneously denied their request to instruct the jury on the sufficiency of evidence against them. Second, Duval and Doucette argue that the court erred in refusing to give their requested instruction on the elements of constructive possession.

The standard of review varies with respect to claims of instructional error. See United States v. Figueroa-Encarnación, 343 F.3d 23, 29 (1st Cir. 2003) (noting this phenomenon). Here, however, the claims of error are such that we review the denial of the requested jury instructions for abuse of discretion. Fryar v. Curtis, 485 F.3d 179, 183 (1st Cir. 2007). In considering whether the district court abused its discretion, we look to see whether the requested instruction was "(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." White v. N.H. Dept. of Corr., 221 F.3d 254, 263 (1st Cir. 2000).

### 1. **The "Constructive Possession" Instruction**

Duval and Doucette claim that the court's instructions on constructive possession were insufficient because it failed to give

their requested instruction that "knowledge alone, however, is not enough to prove possession. Similarly, mere presence in the vicinity of the object is insufficient to prove possession." Duval and Doucette suggest that by failing to give this instruction, the jury was allowed to equate knowledge with possession, and that knowledge alone is not sufficient to establish constructive possession.

Applying the three-factor test set forth in White, 221 F.3d at 263, we note that there does not appear to be any dispute that Duval and Doucette's requested instruction was correct as a matter of law: mere presence in the vicinity of an object is insufficient to prove constructive possession of that object, see United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992), and knowledge of an object's location, without more, is insufficient to establish possession of that object, see United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005) ("[T]here must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." (quoting In re Sealed Case, 105 F.3d 1460, 1463 (D.C. Cir. 1997)). Furthermore, there is little question that the issue of constructive possession was integral to the case.

The district court did not abuse its discretion in denying the requested instruction, however, because the law of constructive possession was "substantially incorporated into the

charge as rendered." White, 221 F.3d at 263. We have said before that a court is not obligated to "follow the exact form and wording of the defendant's proposed instructions." United States v. Gibson, 726 F.2d 869, 874 (1st Cir. 1984). Here, the court very clearly instructed the jury that to find constructive possession it needed to find both "power and intention to exercise control or dominion and control over something," and that Defendants "knowingly possessed the firearms and/or ammunition in question." Thus, it is not the case that the jury was invited to convict based on mere knowledge of the firearms; rather, the jury was plainly instructed that it needed to find knowing possession. Because the court's instructions adequately expressed the law of constructive possession, we detect no error in its denial of Defendant's requested instruction.

### 2. **The "Sufficiency" Instruction**

Duval and Doucette also argue that the court erred by refusing to instruct the jurors that, "if they do not believe Mr. Dyott's testimony beyond a reasonable doubt [that Doucette had told Dyott about the stolen guns], . . . they must acquit the defendant." As we have already explained, the court correctly gave detailed instructions on the elements of the offenses with which Duval and Doucette were charged and a defendant is not entitled to an instruction "on every particular that conceivably might be of interest to the jury." Rosario-Peralta, 199 F.3d at 567.

-25-

Nevertheless, Duval and Doucette put a new twist on their claim, arguing that the requested instruction was necessary because the prosecutor suggested on closing that, in fact, there was sufficient evidence apart from Dyott's testimony to convict Duval and Doucette. In analyzing this claim of prosecutorial misconduct, our first step is to determine whether the prosecutor did in fact make "improper statements" to the jury on closing. See United States v. Lowe, 145 F.3d 45, 50 (1st Cir. 1998) (reaching other elements of test for prosecutorial misconduct only after determining that statements made by the prosecutor were "improper").

We set forth the standard for establishing constructive possession in Wight: the Government must show "that the defendant had dominion and control over the area where the contraband was found." 968 F.2d at 1397. While circumstantial evidence can be used to satisfy this burden, "mere presence or association with another who possessed the contraband is insufficient to establish constructive possession," id., nor is it sufficient to show only that a defendant had access to the weapons, see United States v. Kelso, 942 F.2d 680, 682 (9th Cir. 1991). "[T]he ability and intent to exercise dominion and control over the firearm or area where it is located," however, is sufficient to support a finding of constructive possession. United States v. Robinson, 473 F.3d 387, 399 (1st Cir. 2007).

The prosecutor argued to the jury that, even if they disregarded Dyott's testimony (which had been heavily impeached at trial), the remaining evidence was sufficient to convict. Duval and Doucette argue that the Government's evidence was insufficient, as a matter of law, for the jury to infer constructive possession because apart from Dyott, there was no direct evidence that they knew that the firearms were in the trunk. In support of this claim, Duval and Doucette provide a litany of supposedly analogous cases in which findings of constructive possession were overturned. See, e.g., United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996) (holding that "[w]here possession is not clear," constructive possession requires "some nexus, link, or other connection between the defendant and the contraband."); United States v. Soto, 779 F.2d 558, 560 (9th Cir. 1986) ("It is well established that mere presence as a passenger in a car from which the police recover weapons does not establish possession. The mere proximity of a weapon to a passenger in a car goes only to its accessibility, not to the dominion or control which must be proved to establish possession." (citations omitted)). Furthermore, Duval and Doucette emphasize that here the guns were hidden in the trunk of their car rather than in the passenger compartment, which they argue distinguishes their situation from prior appeals where we upheld jury inferences of constructive possession. See, e.g., United States v. Liranzo, 385 F.3d 66, 69-70 (1st Cir. 2004) (affirming

defendant's conviction where the "precarious, angled position" of weapon suggested it was stashed after car came to stop, and defendant was only person observed moving.). Lastly they aver that, as in Kelso, access to a place where a firearm is located is insufficient to infer knowledge that the firearm is there. 942 F.2d at 682. Absent Dyott's testimony, Duval and Doucette's argument goes, the Government did not offer sufficient evidence to prove that they were aware of the contents of the trunk.

We agree that the evidence could have supported a jury inference that Duval and Doucette did not constructively possess the weapons. However, that is not the question on appeal. The jury found Duval and Doucette guilty, and thus we must determine whether, as a matter of law, the prosecutor was incorrect when he stated that the jury could infer from the evidence presented that Duval and Doucette constructively possessed the firearms found in the trunk even if they disregarded Dyott.

We conclude that there was sufficient evidence apart from Dyott's testimony for the jury to infer that Duval and Doucette constructively possessed the firearms found in the trunk, and thus that the prosecutor's arguments were not improper. Like the defendants in Liranzo, the evidence suggests Doucette and Duval exercised "exclusive dominion and control over the location of the gun." 385 F.3d at 70. Doucette had the keys when the two were apprehended, Duval appeared to avoid opening the trunk upon sight

-28-

of police officers, and the guns were not in the car when it was stolen. Although much of the Government's evidence was circumstantial, we have held that circumstantial evidence may support a finding of constructive possession. United States v. McFarland, 445 F.3d 29, 31 (1st Cir. 2006).

Accordingly, this is not a situation where the evidence showed only a defendant's "mere proximity" to weapons. See Soto, 779 F.2d at 560-61; United States v. Madkins, 994 F.2d 540, 542 (8th Cir. 1993) (holding that it was unreasonable for a jury to infer constructive possession of a weapon from the fact that the defendant was found working under the hood of a car where the weapon was found). Duval and Doucette's reliance on United States v. Blue, 957 F.2d 106 (4th Cir. 1992), is similarly misplaced. In Blue, the Fourth Circuit overturned a conviction where the only evidence presented was the presence of a gun under the defendant-passenger's seat and testimony that the defendant dipped his shoulder as the police officer approached the vehicle. Id. at 107-08. Here, not only was there evidence that guns were in the trunk of the stolen car and that Duval turned away from the trunk when he noticed a police officer, but also that Doucette had the keys to the trunk, that Duval and Doucette had stolen the car and had exclusive possession of it thereafter, and that they had suspiciously registered under a false name at the Chelmsford motel, where the car and the guns were eventually found. This quantum of

-29-

evidence was legally sufficient for the jury to infer that Duval and Doucette constructively possessed the weapons at issue.

Thus, because there was sufficient evidence apart from Dyott's testimony that Defendants constructively possessed the weapons found in their car, we find no error in the denial of a jury instruction to the contrary.

### D. Constitutional Challenges to the ACCA

Duval and Doucette both argue that the Government's failure to plead and prove their prior convictions to the jury renders ACCA sentences invalid under the Sixth Amendment. We review constitutional challenges to the ACCA de novo. United States v. McKenney, 450 F.3d 39, 45 (1st Cir. 2006).

The Supreme Court rejected this very argument in Almendarez-Torres v. United States, 523 U.S. 224, 247 (1998), and has since reiterated its position that the fact of a prior conviction is exempt from the general rule that a jury must find any fact that raises a sentence above the statutorily-prescribed maximum, see United States v. Booker, 543 U.S. 220, 244 (2005); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). We continue to be bound by Supreme Court precedent on this point, and as such, we must reject Duval and Doucette's Sixth Amendment challenge to the imposition of an ACCA sentence. See, e.g., McKenney, 450 F.3d at 46; United States v. Coplin, 463 F.3d 96, 105 (1st Cir. 2006).

## E. **Duval's Challenges to the ACCA Sentence**

In addition to his constitutional arguments, Duval contends that he should not be subject to an ACCA sentence because he has not been convicted of three violent felonies. The ACCA imposes a mandatory minimum sentence on defendants convicted of "three previous convictions by any court . . . for a violent felony." 18 U.S.C. § 924(e)(1). A violent felony is defined as "any crime punishable by imprisonment for a term exceeding one year . . . [that] has as an element the use, attempted use, or threatened use of physical force against the person of another . . . or otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. § 924(e)(2)(B). In determining whether a conviction was for a violent felony, the trial court may look "only to the fact of conviction and the statutory definition of the prior offense." Taylor v. United States, 495 U.S. 575, 602 (1990). In Shepard v. United States, the Supreme Court recognized that where a defendant had plead guilty to a prior crime, a court could also examine a "statement of factual basis for the charge, shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea." 544 U.S. 13, 20 (2005) (citation omitted).

There appears to be no dispute among the parties that Duval had been convicted of at least two violent felonies prior to

his conviction for the instant offense.  Thus, the dispute centers around Duval's third conviction, a conviction for assault and battery under Me. Rev. Stat. Ann. tit. 17-A, § 207, which provides in part that it shall be a crime for a person to "intentionally, knowingly or recklessly cause[] bodily injury or offensive physical contact to another person."[6]  Ordinarily, simple assault and battery is punishable in Maine as a "Class D" offense, id., which provides for a maximum sentence of up to one year in prison, id. § 1252(2).  However, because Duval had previously been convicted of two misdemeanor assaults, he was sentenced under Maine's recidivist offender statute, making Duval's conviction a "Class C" offense, id., which provided for a maximum sentence of five years in prison, id. § 1252 (4-A).  Duval offers two arguments as to why his third conviction should not qualify as a violent felony for the purposes of the ACCA.

### 1. The Recidivist Sentencing Enhancement

First, Duval argues that because assault is usually punishable as a Class D felony with a maximum term of less than one year in prison, his conviction was for a misdemeanor, and thus not a "felony," even though the sentence he received was five years because of Maine's recidivist sentencing statute.  Thus, Duval asks

---

[6]  Because we are unaware of additional information regarding Duval's conviction that could be considered under Shepard, we must rely only on the fact of conviction and the statutory definition of the crime for which Duval has been convicted.  See United States v. Walter, 434 F.3d 30, 38 (1st Cir. 2006).

us to decide whether the word "crime" as used in 18 U.S.C. § 924 (e)(2)(B) means criminal conduct (assault) or criminal conduct in combination with certain attendant circumstances (assault plus recidivism). We ordinarily review de novo a claim that a defendant is not subject to the ACCA de novo. United States v. Mastera, 435 F.3d 56, 59 (1st Cir. 2006).

This question is a novel one in this circuit, but has been addressed by other courts. Duval urges us to adopt the reasoning of the Ninth Circuit in United States v. Corona-Sánchez, 291 F.3d 1201 (9th Cir. 2002) (en banc). In Corona-Sánchez, the Ninth Circuit held that under Taylor's categorical approach, the proper analysis for determining whether a crime was a "felony" would be to "consider the sentence available for the crime itself, without considering separate recidivist sentencing enhancements." Id. at 1209. Thus, the Ninth Circuit found that a prior conviction for petty theft in California, which provides for a maximum sentence of six months, Cal. Penal Code § 490, could not be a felony conviction even though the defendant had been subject to California's repeat offender statute which increased the maximum term to one year, id. § 666. Corona-Sánchez, 291 F.3d at 1210. Also supporting Duval's position is a line of decisions which hold that the ACCA, itself a recidivist sentencing statute, does not alter the nature of the underlying offense, but simply changes the sentencing structure for it. See, e.g., United States v. McGatha,

891 F.2d 1520, 1521-25 (11th Cir. 1990) (concluding that the ACCA is simply a sentencing enhancement provision); <u>United States</u> v. <u>Rumney</u>, 867 F.2d 714, 718 (1st Cir. 1989) ("[T]he three felonies provision is for sentence enhancement and is not an element of a heightened crime.").

The Government, on the other hand, urges us to adopt the reasoning of the Fifth and Seventh Circuits. In <u>Mutascu</u> v. <u>Gonzáles</u>, the Fifth Circuit found that where a defendant had been previously convicted and sentenced under California's recidivist sentencing statute, the ultimate conviction was not merely for "petty theft," but rather for "petty theft with prior jail term." 444 F.3d 710, 712 (5th Cir. 2006). Thus, the Fifth Circuit refused to "atomize" a sentence into its recidivist and predicate components, and held instead that the relevant sentence for the purposes of determining whether a crime was a felony was the sentence "ordered by a court of law." <u>Id.</u> (quoting 8 U.S.C. § 1101(a)(48)(B)). Likewise, the Seventh Circuit has held that recidivist sentencing statutes may be used to determine the maximum sentence for a prior conviction when deciding whether a prior drug conviction constituted a "serious drug offense" for the purposes of the ACCA. <u>United States</u> v. <u>Henton</u>, 374 F.3d 467, 469-70 (7th Cir. 2004). The Fourth Circuit has suggested a similar conclusion, although it noted that the maximum sentence imposable under a recidivist sentencing statute might depend on compliance with

-34-

additional safeguards codified in state law.  United States v. Williams, 326 F.3d 535, 539-40 (4th Cir. 2003).

The parties also point to recent Supreme Court decisions on sentencing issues to support their positions.  In Apprendi, the Supreme Court very explicitly stated that "recidivism 'does not relate to the commission of the offense' itself."  530 U.S. at 496 (quoting Almendarez-Torres, 523 U.S. at 230).  Duval contends that this statement supports his argument that his recidivist sentence was the product of a sentencing enhancement and not a change in the underlying offense.  The Government points us to Ewing v. California, in which the Court, reviewing California's recidivist sentencing statute, explained that the petitioner had not been convicted of "merely 'shoplifting three golf clubs.'  Rather, Ewing was convicted of felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of at least two 'violent' or 'serious' felonies."  538 U.S. 11, 28 (2003).  This, the Government argues, supports its argument that recidivist sentencing statutes in effect create new "recidivist crimes," which might be construed as felonies even if the underlying offense was a misdemeanor.

These arguments highlight two conundrums.  The first is that by using state-law definitions of crimes to determine sentencing on federal offenses, Congress may have allowed states to disturb the balance struck in the ACCA: repeat offenders would be

subject to higher sentences, but only if they had committed three violent felonies. For example, it appears that under Maine's recidivist sentencing statute, a person might be convicted of three violent "felonies" (and thus sentenced under the ACCA) even if he had only been twice convicted of certain felony offenses (robbery) and once of a misdemeanor offense (assault). This would seem to disturb Congress's determination that the ACCA should be applied only to hardened criminals, i.e., those who have committed three (rather than two) crimes whose nature is so serious that they are punishable as felonies.

Second, this case highlights the ambiguous status accorded to recidivist sentencing statutes. The Government asks us to classify Duval's third offense as "recidivist assault," an offense that is different than non-recidivist assault. However, in light of the Supreme Court's holding in Apprendi that a maximum sentence may not be raised based on elements of the offense not pleaded and proven to a jury, 530 U.S. at 490, this calls into question Almendarez-Torres's holding that, in fact, prior convictions need not be proven to a jury before they are used to increase a sentence beyond the statutory maximum. 523 U.S. at 239-247 (rejecting argument that recidivism is an element of a crime that needs to be plead and proven to a jury); see Rangel-Reyes v. United States, 126 S. Ct. 2873, 2874 (2006) (Thomas, J., dissenting

from denial of certiorari) (urging the Court to overrule Almendarez-Torres for this reason).

In spite of the difficult questions that the Government's position presents, we are ultimately persuaded that logic and precedent support the conclusion that Duval was convicted of "recidivist assault," and thus was convicted of a felony. First, although Apprendi stated that recidivism did not necessarily relate to the commission of an offense, 530 U.S. at 496, this does not mean that an offense could not be defined with respect to recidivism. In fact, since Apprendi was decided, Ewing construed a conviction under California's repeat offender statute as recidivist theft, 538 U.S. at 28, and more recently, in López v. Gonzáles, the Court noted that state drug possession statutes correspond to federal drug statutes, including "possession of cocaine base and recidivist possession," 127 S. Ct. 625, 630 n.6 (2006) (emphasis added). We acknowledge that these holdings create some tension with Almendarez-Torres, but as Justice Thomas noted in his dissent from denial of certiorari in Rangel-Reyes, the Supreme Court is "the only court authorized to" overturn that decision. 126 S. Ct. at 2875.

Furthermore, although there are some anomalies in having Maine's recidivist offender statute affect the operation of the ACCA's recidivist offender scheme, this is not a unique situation. A single conviction in Maine for simple assault is ordinarily not

treated as a felony for ACCA purposes because it carries a penalty of less than one year, Me. Rev. Stat. Ann. tit. 17-A, §§ 207, 1252(2), whereas a conviction for the exact same conduct in Massachusetts would be treated as a felony because Massachusetts law punishes assault by up to two and a half years, Mass. Gen. Laws ch. 265, § 13A(a). Moreover, states use different characteristics to categorize the same crimes as felonies or misdemeanors. Maine makes assault a felony if it is accomplished with the use of a firearm, see State v. Gilbert, 473 A.2d 1273, 1275 n.1 (Me. 1984) ("Criminal threatening is a Class D crime, which, when committed with use of a dangerous weapon, is enhanced to a Class C offense."), whereas Oregon uses the presence of a victim's minor child to turn a simple assault into a felony, see United States v. Moreno-Hernández, 419 F.3d 906, 910, 915 (9th Cir. 2005) (also noting that a conviction with such an enhancement would qualify as a felony crime of violence). It appears that Congress implicitly accepted such inconsistencies in the application of the ACCA because it was concerned about federalism and wanted to preserve the state's role in defining, enforcing, and prosecuting essentially local crimes:

> In "enhancing" this [federal firearms] offense with [ACCA]-type sanctions, if the defendant has been convicted three times of robbery or burglary, we are "enhancing" an existing Federal crime, which would alleviate many of the problems associated with [the ACCA] such as the issue of a local D.A. veto or the difficulties encountered by Federal courts in

-38-

> applying State robbery and burglary laws in Federal prosecutions.

H.R. Rep. No. 1073 at 5, reprinted in 1984 U.S.C.C.A.N. 3665. We can only assume that Congress thought that these federalism concerns would outweigh whatever inconsistencies arose.

In addition, as one of the dissents in Corona-Sánchez pointed out:

> Raising an offense from a misdemeanor to a felony has effects far beyond the extra time defendant might serve. While employers may be willing to overlook a misdemeanor in potential employees, they are much less likely to hire convicted felons, especially for positions of trust and responsibility. Suffering a felony conviction, rather than a misdemeanor, can also have serious effects on personal relationships and reputation in the community. Moreover, under [California] law, felons suffer a variety of limitations and disabilities that misdemeanants do not. Misdemeanor sentences are served in local jails, while felony time is spent in state prison. For the rest of their lives, felons (but not misdemeanants) are denied the right to vote . . . and the right to bear arms.

Corona-Sánchez, 291 F.3d at 1219 (Kozinski, J., dissenting in part and concurring in part) (internal citations omitted). So too here. See, e.g., Me. Rev. Stat. Ann. tit. 17-A, § 1252(1)(A)(2) (specifying that a class C felon sentenced to more than nine months in jail are committed to the Department of Corrections); Me. Rev. Stat. Ann. tit. 8, § 275-D(5)(D)(2) (listing Class C felony conviction as a ground for denying an off-track betting facility license); 28 Me. Rev. Stat. Ann. tit. 28-A, § 653(2)(A) (listing

-39-

Class C felony conviction as a ground for denying liquor license). It would be unusual if a court could not consider Duval's conviction as a felony for the ACCA when Maine law would recognize it as such for state-law purposes.

If Congress finds fault in the pattern of inconsistent sentences mandated by the ACCA, it is within its power to amend it. However, as it presently stands, the ACCA defines a felony as "any crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 924(e)(2)(B). Because Duval was convicted of a crime which provided for punishment of up to five years, he has been convicted of a felony for the purposes of the ACCA.

## 2. Is Assault a Violent Crime in Maine?

Duval also argues for the first time on appeal that even if his assault conviction was for a felony, it was not for a violent crime. Duval argues that because the charging documents and plea agreement provide no indication as to the nature of the assault that he committed, we must find that he engaged in the minimum level of culpable conduct punishable under the assault statute, i.e., "recklessly causing offensive physical contact," and that this conduct would not qualify as a violent crime. Because Duval did not raise this objection to his sentence below, we review that objection for plain error. United States v. Bennett, 469 F.3d 46, 51 (1st Cir. 2006). Plain error requires that the defendant show that "(1) that an error occurred (2) which was clear or

-40-

obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

We detect no plain error in the district court's determination that a conviction in Maine for simple assault constitutes a crime of violence for the purposes of the ACCA. In United States v. Nason, we explicitly stated that "both variants of assault regulated under Maine's general-purpose assault statute necessarily involve the use of physical force," and concluded that a conviction in Maine for simple assault qualified as a crime of domestic violence for the purposes of 18 U.S.C. § 922(g)(9). 269 F.3d 10, 21 (1st Cir. 2001). Nason is the only case cited by either party to have interpreted the Maine assault and battery statute, and we cannot distinguish it in any meaningful way from the circumstances of Duval's case. Until such time as we revisit Nason en banc, see United States v. Allen, 469 F.3d 11, 17 (1st Cir. 2006) (noting that, absent extraordinary circumstances, three-judge panels are bound by prior circuit panel decisions), we are bound to apply its holding that even "offensive contact" constitutes a violent felony under Maine's assault and battery statute.[7]

---

[7] Although my colleagues would prefer not to address the issue, I consider that circuit law on this point is in some disarray. We have strongly suggested that a conviction under the Massachusetts

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

**Affirmed**.

---

assault and battery statute -- which is similar to the Maine statute -- would not constitute a crime of violence for purposes of the ACCA absent evidence that the conviction was for a "violent" assault, rather than for an offensive contact. See United States v. Mangos, 134 F.3d 460, 464 (1st Cir. 1998) (noting that the Massachusetts assault and battery statute "involves different types of offenses, some arguably violent and some not"); United States v. Fernández, 121 F.3d 777, 779 (1st Cir. 1997) ("[B]oth violent and non-violent conduct is covered by the [Massachusetts assault and battery] statute."). I think that the circuit might do better to resolve this disarray in light of the fact that the imposing a sentence under ACCA often makes a world of difference to the amount of prison time a defendant receives. See James v. United States, 127 S. Ct. 1586, 1602 (2007) (Scalia, J., dissenting) ("Imprecision and indeterminacy are particularly inappropriate in the application of a criminal statute. Years of prison hinge on the scope of ACCA's residual provision, yet its boundaries are ill defined.").